## FREDERICK W. NORTHROP, TRUSTEE vs. CORNELIUS S. BUSHNELL.

The defendant, in 1857, subscribed for certain preferred stock of a fire insurance company, and in January, 1859, subscribed for ten shares of common stock of the company, for which he executed to the company his promissory note for $1,000. In February, 1859, the defendant was elected a director in the company, and continued such for two years. In 1861, the company being insolvent, the defendant, in order to avoid litigation, and to obtain possession of property which he had pledged to the company as security for the note made a payment on the note, which with other payments previously made amounted to $695, and the company then agreed with him that such payments should discharge him from further liability on the note.

In an action brought by the trustee in insolvency of the company against the defendant, to recover the balance of the note, it was holden, 1. That the defendant could not set up in defence, as against the plaintiff, that he was induced to subscribe and give the note by fraud and false representations as to the condition of the company and the value of the stock, and that the stock was worthless, and the note without consideration. 2. That the agreement of the company to discharge the defendant was not valid as against the creditors of the company, or the plaintiff as their representative, and was no defence to the action.

ASSUMPSIT, by the trustee in insolvency of the State Fire Insurance Company, upon a promissory note given by the defendant for a subscription to the capital stock of the company; brought to the Superior Court in New Haven county, and tried on the general issue with notice closed to the court. The court found the following facts, and reserved the case for advice.

The company which did business in New Haven under the name of "The State Fire Insurance Company," and a trustee of whose estate in insolvency for the benefit of its creditors the plaintiff in this suit claimed to be, was no otherwise organized than as follows. A charter for an insurance company by that name was passed by the legislature of Connecticut, at its May session, 1855. Six of the eight corporators named therein never in any way participated in any proceedings had for the purpose of organizing a company under the provisions of the charter, and some of them did not know that they were named as such corporators until January, 1870. The other two persons named as corporators died

Northrop v. Bushnell.

before the trial of this case, and no evidence was offered tending to show that they, or either of them, ever in any way participated in proceedings had for the purpose of organizing the company, or knew that they were such corporators. The plaintiff offered in evidence the record books, books of account and papers of the company known as the State Fire Insurance Company, but nothing appeared upon them showing, or tending to show, the time, place, or manner in which said company was organized, and no evidence was offered by the plaintiff upon that subject.

The company opened an office in New Haven for the transaction of business as a fire insurance company, in the summer of 1857, with a nominal capital of $150,000, which was represented by the common stock of the company, amounting to about $150,000, all held by New York parties. It did not appear from the books of the company when or where this stock was subscribed for or taken. Mortgages upon land in the northerly part of the state of New York, in the Adirondack region, in Franklin and Essex counties, were given to secure portions of the stock, to the nominal amount of $103,500. The remainder of the stock, amounting to $47,500, was paid for by indorsed notes. The capital of $150,000 was not otherwise paid for or secured, and the company treated it as fully paid-up stock, issued certificates of stock therefor, and did an insurance business thereon, from November, 1857, to February, 1859. On the 31st of March and the 1st of April, 1858, a single share of stock was issued by the company to each one of eleven persons in the city of New Haven, for the purpose of qualifying them to act as directors, for which no consideration was paid.

On the 6th of August, 1857, the directors of the company voted to increase its capital to $200,000. Another vote was passed by the directors on the 18th of November, 1857, providing for an increase of the capital from $150,000 to $200,000, and a committee was then appointed to carry the vote into effect. On the 8th of February, 1858, the committee reported to the directors that said additional capital was all received and in possession of the company, which report was

accepted, and the committee discharged. The directors at the same time voted to advertise in the city papers of New Haven, and announce its readiness to transact business. Pursuant to the vote, the company inserted and continued to publish in the New Haven newspapers, for more than a year from and after February, 1858, the following advertisement, purporting to be signed by its officers.

" State Fire Insurance Co., City Bank Building, New Haven, Ct. Capital $200,000.

" This company having completed its organization, with a capital of $200,000 securely invested, are prepared to insure buildings, merchandise and personal property generally, at the established rates of responsible companies."

The company, by means of business cards and printed circulars, published statements at various times during the same period, that it had a capital of $200,000, and also a surplus. The last mentioned addition to its capital of $50,000 was a preferred stock, having a year to run, and was annually renewed for two years successively after the expiration of the year commencing on or about February, 1858. This stock was taken by New Haven parties, who paid for it in their promissory notes. The defendant gave collateral security for the note given for his part of the preferred stock. The holders of it were to receive four per cent. upon their stock annually, and were not to be called upon to pay their notes until the remaining $150,000 of capital was exhausted in paying the expenses and losses of the company.

At a meeting of the directors held on the 5th of January, 1858, a committee of five was appointed to procure new subscribers to the capital stock, to be issued as a substitute for, and to supercede, the $47,500 of stock paid for by notes as aforesaid. Benjamin Noyes of New Haven was one of the committee appointed under this vote, and was furnished by the secretary of the company, for the purpose of aiding him in obtaining the new subscriptions, with written statements, purporting to give an account of the then condition of the company, in which it was stated that the company had a fully paid up capital of $150,000 ; that all of it was well secured,

and most of it was loaned upon real estate security of more than double the value of the amount secured; that the company had a handsome cash surplus on hand; that its officers were first class men, and that the company was in a very prosperous condition, and perfectly sound. Some of these statements were untrue.

Noyes communicated these statements to the defendant, and also represented to him that the company was legally and properly organized under its charter, he, Noyes, believing the statements to be true. The defendant, on the faith of these representations, relying upon them and believing them to be true, was induced thereby, on or about the 20th of January, 1859, to subscribe for ten shares of the capital stock of the company, and to give his stock note therefor, dating it back to December 31st, 1868, and to secure the note by a transfer of certain railroad bonds to the company, as collateral. About the same time other parties in New Haven subscribed for stock to the amount of about $50,000. On the 2d of February, 1859, at a meeting of the directors, the committee reported that said $50,000 of stock had been subscribed, and the following preambles and resolution were unanimously passed " Whereas certain parties of the city of New Haven have subscribed for $50,000 of the capital stock of this company, dating on the 31st day of December, 1858, and given notes with collateral securities for the same, and whereas other parties had previously subscribed to certain portions of said capital stock, and interest upon the securities of the last named parties had accrued previous to said last subscription of $50,000.

Therefore, resolved, that the interest upon securities deposited by the first named subscribers to December 31st, 1858, be paid or cancelled by a dividend to be declared at such time as may be thought advisable by the board of directors, and said dividend to be declared previous or in addition to any other dividend which may be made by said company."

At a meeting of the directors on the 24th of October, 1857, a finance committee was authorized and appointed; at a meeting of which committee held on the 17th of February, 1859,

the following preamble and resolution were unanimously adopted:

"Whereas, upon the organization of the State Fire Insurance Company, certain promissory notes were deposited with said company to constitute a part of the capital of said company, to wit, to the amount of $47,500, and whereas, said notes have never been accepted by the finance committee in accordance with the by-laws of said company, nor admitted by said committee to constitute any part of the capital of said company, and the persons depositing said notes having never been admitted to be, and having never claimed to be, stockholders in said company; and whereas, in the opinion of the finance committee, said notes are not a proper basis for the capital of said company, or any part thereof, and the amount of capital represented by said notes having been subscribed by certain other persons, and secured to the acceptance of the finance committee:

Therefore, it is resolved unanimously by the finance committee, that said notes be cancelled, and the secretary is directed to deliver said notes to the persons depositing the same, upon demand."

The certificates of stock which had been issued to the parties who subscribed for and had taken said $47,500 of stock were afterwards returned to and cancelled by the company, and new certificates of stock were issued to those who last subscribed for stock as aforesaid.

The company continued to do an insurance business until the early part of the year 1861, when outstanding claims against the company accumulated to the amount of about $24,000. An instalment of ten per cent. upon the common stock was called in by a vote of the directors on the 5th of November, 1860, and unsuccessful efforts were subsequently made by the directors to collect the same from the holders of that portion of the stock which had been secured by mortgages upon the Adirondack lands. Neither then, nor at any subsequent time, could anything be collected on that stock, and nothing has ever been realized therefrom, nor from said lands. The expenses of the foreclosure and sale of said

lands (a portion of them having been sold for taxes) exceeded the amount received for them at the foreclosure sales.

Benjamin Noyes was elected secretary of the company on the 20th of August, 1861, and a by-law of the company authorized the secretary " to collect all moneys due the company."

At a meeting of the directors on the 20th of August, 1861, the following votes were passed.

" *Voted*, That the president and finance committee of this company be, and they are hereby, authorized and directed to allow as an offset against any debt, instalment or claim due to this company, any debt or claim acknowledged by the company to be due and owing from it; and that any person holding any claim or debt acknowledged to be due from the company, whether acquired by assignment or otherwise, who is authorized to give a valid discharge to this company for the same, may apply the same as aforesaid.

*Voted*, That in case of the payment of any debt due or owing to this company, which debt is secured by mortgage of real estate or pledge of personal property, the secretary of the company shall be, and is hereby, authorized to quitclaim, release and discharge all claim of this company upon the real estate so mortgaged, or the personal property so pledged, and for that purpose may sign, seal, execute, and acknowledge in the name of this company, all proper instruments of quitclaim, release and transfer."

Noyes, as secretary and director, and as a member of the finance committee, and under directions of the other directors, soon after negotiated with the defendant with reference to a settlement of the claims of the company against the defendant, for what was then claimed to be due upon his stock and stock note. The defendant denied his liability thereon by reason of the facts aforesaid, and at first refused to pay anything ; but afterwards, in order to regain the possession of the bonds held by the company as collateral security for his note, to avoid litigation, and being assured by Noyes, and relying upon it, that settlements could and would be made under the last preceding vote, by which all the liabilities of the company would be compromised and paid, he agreed with the company,

through Noyes, to pay, and did then pay, to the company the sum of $400, and released a claim of $120 which he had against the company.

The company, through Noyes, afterwards made other calls at other times upon the defendant for more money, and in order to regain his collaterals, the defendant deemed it best to pay, and did pay, to the company money upon two other occasions, amounting in all, including said first payment and his claim as allowed, to the sum of $695, and received, at the time of making his last payment, his stock note and the collaterals he had lodged with the company as security. And in consideration of all the aforesaid payments by the defendant, Noyes agreed for the company that said payments should be a discharge of the defendant's liability as a stockholder. When making said payments the defendant denied all legal obligations to pay any thing upon the stock and note. The doings of Noyes were reported to and approved by the directors.

Without the previous knowledge or consent of the defendant, he was elected a director of the company on the 2d of February, 1859. He was re-elected a director in February, 1860.

Proceedings in involuntary insolvency were commenced against the company in the probate court for the probate district of New Haven, on the 22d of June, 1861, by Henry J. Fox, one of the company's creditors, and were duly continued until the 26th of July, 1861, during which time the petition of J. M. Edwards, another creditor of the company, to be made a party to the proceedings was filed in said court. On the 26th of July, 1861, the court granted the prayer of the first mentioned petition, and passed a decree ordering the appointment of a trustee on the company's estate; after which, and before any trustee was so appointed, the company compromised and settled the claims against it of the petitioning creditors, and afterwards, on the 10th of September, 1861, at the request of the petitioning creditors, and with the assent of the company, in open court, no one objecting, the petitions were withdrawn, and the proceedings thereon discontinued by

order and decree of the court; and the company continued thereafter to transact business in the same manner as if no such petitions had been brought, until November 2d, 1861, except that the company issued no new contracts of insurance after May 27th, 1861, when the company lodged in said probate court its voluntary assignment for the benefit of its creditors, under which the present plaintiff was afterwards duly appointed trustee of the company's estate.

The company before assignment in insolvency, and the assignee subsequently, made demand upon the defendant for payment of his note.

*Doolittle*, for the plaintiff, cited *Shipman* v. *Ætna Insurance Co.*, 29 Conn., 254 ; *Eastern Bank* v. *Capron*, 22 id., 643 ; *Roe* v. *Jerome*, 18 id., 155 ; *Hope Mut. Ins. Co.* v. *Weed*, 28 id., 67 ; Reporter's note in *Calhoun* v. *Richardson*, 30 id., 230 ; *West Winsted Savings Bank* v. *Ford*, 27 id., 283 ; *Mann* v. *Cooke*, 20 id., 178–9 ; *Hope Mut. Life Ins. Co.* v. *Perkins*, 38 N. Y., 408 ; *Hubbard* v. *Briggs*, 31 id., 518, 532 ; *Eaton* v. *Aspinwall*, 19 id., 119 ; *Buffalo & Alleghany R. R. Co.* v. *Cary*, 26 id., 75 ; *Ogilvie* v. *Knox Ins. Co.*, 22 How., 380, 391 ; Abbot Dig. on Corp., 796 ; *Thayer* v. *City of Boston*, 19 Pick., 516 ; 2 Parsons Cont. (1st ed.), 279 ; *Masson* v. *Bovet*, 1 Denio, 69.

*C. Ives*, for the defendant.

1.  The plaintiff's right, title and interest in the subject matter of this suit, legal and equitable, having been acquired under a general assignment for the benefit of creditors, are precisely the same as the assignor possessed at the time the assignment was made. Creditors cannot take through the assignee what the debtor did not legally or equitably have when he assigned for their benefit. Nor can the defendant be deprived of any of his defences by any steps which a pretended creditor of his may see fit to take. *Vansands* v. *Middlesex Co. Bank*, 26 Conn., 153 ; *Palmer* v. *Thayer*, 28 id., 245 ; *Litchfield Bank* v. *Peck*, 29 id., 384 ; *Hubbard* v. *Briggs*, 31 N. Y., 532, 534.

2. Nothing is due upon the note in suit, because it was obtained by means of the grossest fraud practised by the assigning company upon the defendant. It is claimed that the law is so that this great fraud can be enforced by a court of justice, and the doctrine of estoppel *in pais* is relied upon by the plaintiff to enable him to recover. If, as in the case of the defendant in *Litchfield Bank* v. *Church*, 29 Conn., 137, the present defendant was an original stockholder, and a party to the original fraudulent organization, and had subscribed, like Church, " for the very purpose of aiding its accomplishment," the plaintiff might with more propriety make this claim. But all the stock authorized by the charter had been issued long before the defendant gave his note to the company for ten shares of its stock. It could not therefore issue any more new stock, and what its finance committee went through the forms of doing in a bungling way, was to take $47,500 of its old stock from the stockholders who had held and owned it for between one and two years, and sell it to responsible parties, of whom the present defendant was one. If it was anything, it was *in substance* a sale by the company of ten shares of its old common stock, but in *form* it was a subscription to its capital stock. In no sense, and with no shadow of truth, can the present defendant be said to have combined with these New York rogues, " for the very purpose of aiding them in accomplishing" a fraud upon the public, as was said of Church. This case is therefore strikingly like that of *Litchfield Bank* v. *Peck*, 29 Conn., 384. In that case it was urged, as in this, that the defendant by taking the stock had enabled the company to perpetrate a fraud on the public. But the court held that the original subscribers to the stock were alone liable, and not one who had fraudulently been induced to take from the company its stock after it was already organized. *National Exchange Co.* v. *Drew*, 32 Eng. L. and Eq., 1; *West Winsted Savings Bank* v. *Ford*, 27 Conn., 291; *City Bank of Columbus* v. *Bruce*, 17 N. Y., 511; *Hubbard* v. *Briggs*, 31 id., 532, 534; *McMullen* v. *Wenner*, 16 Serg. & R., 21. The claim made that the defendant is estopped from setting up as a defence the fraud that has been practised

upon him, because the plaintiff's assignor made use of the avails of the fraud to bolster up its credit, is unsupported by any precedent. *Roe* v. *Jerome*, 18 Conn., 155; *Walker* v. *Vaughn*, 33 id., 585.

3. No consideration was given for the note. The stock was utterly worthless. The entire amount of stock authorized by law had been already issued. The block of stock, the certificates of which were returned, was not attempted to be withdrawn to make room for the stock issued to the defendant and others, until after the note in suit was delivered. This block of original stock was never in fact cancelled, and it still exists to-day. The finance committee undertook to vote it out, but they failed for the want of power. They were created for no such purpose. Neither the company nor its directors ever cancelled the old stock, and the new stock was an over-issue, and therefore a void and illegal issue.

4. The plaintiff cannot recover, because his pretended cause of action was fully settled by a compromise made by and between the State Fire Insurance Company and the defendant, before the assignment to the plaintiff.

The subject matter of the compromise was a claim made by the company against the defendant, which the latter *bonâ fide* denied. It is evident from the record that the defendant had good reason to think and to claim, that he was neither bound in law, equity, or conscience to pay said claim, or any portion of it. To avoid litigation he consented to pay, and did pay, $695 as a full and complete settlement of the claim which the company made upon him, and which the defendant disputed. 1 Parsons Cont., 363, 364. *Allis* v. *Billings*, 2 Cush., 19; *Russell* v. *Cook*, 3 Hill, 506. The settlement was not in form or substance a giving away or relinquishing, without consideration, by an insolvent of his assets to the prejudice of his creditors, as was clearly the case in *Mann* v. *Cooke*, 20 Conn., 178.

5. The defendant has failed to establish the legal existence of the State Fire Insurance Company, as was his duty under the pleadings, in order to have a standing place in court. *Christian Society in Plymouth* v. *Macomber*, 3 Met., 235. ⸱ ⸱s of Practice, 18 Conn., 577, sec. 5.

FOSTER, J.   The plaintiff is the assignee and trustee of the State Fire Insurance Company, now insolvent, the estate of which is in settlement in the court of probate for the district of New Haven, under our statutes in such case provided.

From the finding in the court below it appears that on or about the 20th of January, 1859, the defendant subscribed for ten shares of the capital stock of said company, and gave his note for the amount, $1,000, being the note described in the declaration, which was dated back to December 31st, 1858. Payments to the amount of $695 are acknowledged to have been made on this note, and this suit is brought to recover the balance.

The defence is rested mainly on two grounds: first, that fraud and false representations as to the condition of the company and the value of the stock induced the defendant to subscribe, and to give this note, but no obligation was imposed, the stock being worthless, and the note wholly without consideration. Second, that prior to the appointment of the plaintiff as trustee of said company, the defendant compromised, settled, and paid all claims of said company against him, as set forth in the declaration.

The history of this company, so far as it is detailed in the record before us, is anything but creditable to those who controlled its affairs. It was incorporated with a capital of $150,000, by a resolution of the General Assembly passed in 1855, conferring the usual powers and privileges, with the provisions usually incident to such acts of incorporation. How it affected its organization does not distinctly appear, but it seems that it must have been in some mode not pointed out by its charter. Nearly fifty thousand dollars—$47,500—of its capital stock were made up of indorsed notes, the makers and indorsers of which could not always be found, and if found were not worth finding—it was worthless paper. The remaining $100,000 of the capital stock were made up of notes, purporting to be secured by mortgages on real estate in the Adirondacks, and other romantic regions in the state of New York. These notes proved to be worse than simply worthless, for the foreclosure sales of the real estate fell

short of paying the costs and expenses incurred in the legal proceedings. In 1857 the capital stock of the company was increased to $200,000. The $50,000 required to make up this amount was made a preferred stock. Of this the defendant took $2,000, and gave his note with security therefor, renewing it from time to time till January, 1861. In 1859 the certificates for the $47,500 of the stock for which indorsed notes had been given were cancelled, and the stock re-issued, and it was for ten shares of this stock for which the defendant subscribed, and gave the note now in suit.

We think the strictures of the defendant's counsel upon the operations of this company, and upon its officers who held it out to the public as having a fully paid-up capital of $200,-000, well secured, and most of it loaned on real estate security of more than double the value of the amount secured, severe as those strictures were, are fully deserved. That the originators and prime managers of this speculation, for it was nothing else, were in an adjacent state, does indeed appear; but still it is a reproach to our community, a stain upon the character of our state, that such things should be.

Soon after the defendant made his subscription to these ten shares of stock, and gave the note now in question, to wit, on the 2d of February, 1859, he was elected a director of the company. The record states this to have been done without his knowledge or consent. That it was so done is a fact, so far as we can discover, of no legal importance or significance. Neither previous knowledge nor previous consent was necessary to the validity of the appointment. What part he took, or whether he took any, in the direction of the company, the record does not disclose. It appears, however, that in February, 1860, he was re-elected a director, and no mention is made of any subsequent election. Early in 1861 the company was in trouble on account of losses; they issued no new policies after May 27th of that year, and for aught that appears the defendant was a member of the last board of directors ever elected. At all events he must be considered as chargeable with the duties and responsibilities of a director for two years, as his election and re-election cover that period of time.

In view of all these facts, shall false representations as to the condition of this company, and the value of the stock subscribed for by this defendant in January, 1859, for which this note was given, now avail him as a defence to this action? We say no, decidedly. We certainly are not disposed to enforce a contract obtained by fraud and falsehood; to hold a party to the payment of a note so procured, for a worthless consideration; but, as we regard this case, it would be a fraud on the creditors of this company, a fraud on the public, to permit such a defence to be successful.

This defendant had some means of ascertaining the condition of this company when he became a subscriber to its preferred stock in 1857. In January, 1859, he subscribed for ten shares, parcel of the $47,500 of the original capital stock, which had been taken by men of straw, and palmed off upon the public as solid capital. The original certificates of this stock were then cancelled, and the stock re-issued. Soon after the defendant became a director of the company. Then, if never before, he had abundant means of ascertaining the real condition of the company. Had he done so, and learned, what his counsel now asserts to be true, that there was no soundness in it, his course would have been a plain and easy one. He should have promptly resigned his office of director, stigmatized the fraud practised on him as it deserved, repudiated the contract into which he had been entrapped, tendered back his certificate of stock, and demanded his note and the securities pledged for its payment. Had the company refused to comply with this demand, and shown the boldness, not to say the impudence, to sue his note, we think his defence would have been most ample.

Instead of this course, the defendant allowed his name to go before the public as one of the directors of this company, and so to continue for two years or more. Meantime the company issued numerous policies to individuals, who paid their money, trusting to the ability of the company to indemnify them to the amount paid for in case of loss; the name of the defendant as a director being, not improbably, one of the prominent causes of obtaining for the company the public trust and confidence.

It is too late now to make this defence. If the defendant neglected to make any examination into the affairs of this company, and knew nothing of its condition, after some four years of opportunity to do so, and after being for two years a director of the company, it is but just, under the circumstances, that he should suffer the consequences of that neglect. The question is not now between him and the company alone, it is between him and the creditors of the company, represented here by the plaintiff as trustee. However guilty the company may be, these creditors are innocent. They trusted the company, reposed faith in it, and were warranted in doing so, for there was the name of the defendant as a director, and they might have taken that as a guarantee of its responsibility and integrity. The plainest principles of justice and sound policy forbid the defendant from setting up, to defeat this action, the fraud practised on him which he could easily have found out and exposed years ago, and so have saved these creditors from becoming victims of a fraud perpetrated, in part at least, under the sanction of his name. It certainly does not appear, nor have we any idea, that the defendant was knowingly a party to any fraud practised by this company. We think it very clear that he was not. Still, it is better that he should bear the consequences of his own inattention or negligence, which he might have averted or remedied, rather than impose those consequences on others, fully as innocent as himself, who were powerless either to avert or remedy them. These creditors must still be sufferers, for it may safely be taken for granted that this company will not have the means to pay its debts, while the defendant is merely held to pay an obligation voluntarily assumed.

The remaining ground of defence we regard also as insufficient. It appears that the defendant had from time to time made payments on this note, which, with a payment made in September, 1861, amounted to the sum of $695. The secretary of the company then agreed that said payments should be a discharge of the defendant's liability, and this action of the secretary was reported to and approved by the directors of the company.

That payment of part of a debt is no consideration for the discharge of the whole debt, is well established law; but where there is a controversy between the parties as to the amount due, it is equally well established that payment and acceptance of a portion of the demand claimed, in settlement of the whole, is a discharge of the whole claim. The defendant denied his liability on this note, and made payments with a view to avoid litigation, and obtain possession of his collaterals which had been lodged as security for its payment. Proceedings to put the company into involuntary bankruptcy were commenced in June, 1861, but the petitions were withdrawn and proceedings stayed on the 10th of September, 1861. Between this and the 2d of November, 1861, this arrangement for a settlement was effected. On this last mentioned date the company made a voluntary assignment in the court of probate for the benefit of their creditors.

This note was given for a portion of the capital stock of this company. When this agreement to discharge the defendant from further liability was entered into, the company was no doubt insolvent. At all events it was not in a condition to tell a debtor to write four-score, when the debt was a hundred. We adopt the reasoning of Judge CHURCH, and the law as laid down in the case of *Mann* v. *Cooke*, 20 Conn., 188, considering it strictly applicable. "If the corporation had the power by such a stipulation as this, or by any other, to preclude themselves from a remedy to enforce payment of the full amount subscribed for, it does not follow that the creditors of the company can be precluded by any such condition. * * * It would pervert some of the great ends of its being, and the objects of its charter, if it had legal power to dispose of its stock upon any terms which should defeat the public interests, and defraud its own creditors." The creditors in that case were represented by a receiver; in this by a trustee.

The claim that this company was not properly organized, and has no legal existence, has not been much pressed. It cannot be available in this stage of the case, with the general issue only pleaded, and with the fact found that the defendant

gave the note to the corporation as such. *West Winsted Bank* v. *Ford*, 27 Conn., 282.

The Superior Court is advised to render judgment for the plaintiff, to recover the amount unpaid on said note, with interest.

In this opinion the other judges concurred.