THE EASTON NATIONAL BANK

*v.*

THE AMERICAN BRICK AND TILE COMPANY et al.

On appeals of Frederick Green, individually, and Frederick Green, executor, &c., of Henry Green, deceased.

[Argued December 1st, 1905.    Decided June 18th, 1906.]

1. In the winding up of an insolvent corporation the receiver instituted proceedings by petition against certain stockholders for enforcement of their liability for unpaid subscriptions to the extent required for the payment of the claims of certain creditors, including one G., he being both a creditor of the company and at the same time a delinquent stockholder.  G. was a party upon the record in the court of chancery, but only as a defendant stockholder.  The court of chancery held the stockholders liable to the extent required for payment of the claims of certain creditors, but excluded the claim of G. from those entitled to contribution.  From the latter part of the decree G. entered an appeal in due form and filed his petition of appeal in this court.  The respondents here (they being the other delinquent stockholders) answered the petition of appeal, but in the answers raised no question of G.'s right to appeal.—*Held*, that an objection first raised at the hearing of the appeal, that G. had no status as a party in the court below such as would entitle him to an appeal from so much of the decree as denied relief to the receiver in respect to his claim, came too late.

2. The receiver of an insolvent corporation filed a petition in chancery against certain stockholders to require them to contribute their unpaid stock subscriptions to the extent required to satisfy certain debts of the company, including a debt claimed by G., which had been accepted and admitted by the receiver as a claim against the corporation.  The stockholders answered the receiver's petition and thereby questioned the right of G. to resort to the stockholders' liability, without, however, questioning the validity of his claim as against the company or asserting that it was barred by the statute of limitations.—*Held*, that upon appeal the delinquent stockholders would not be permitted to raise the question whether the claim of G. was barred by the statute of limitations.

3. The bar of the statute of limitations must be specially pleaded, unless the facts that raise it appear to be admitted.

4. Indulgence will not be granted to a party who fails in due time and proper form to invoke the protection of the statute of limitations.

5. An agreement between a corporation organized under the General Corporation act of 1875 (*1 Gen. Stat. p. 907*), and its stockholders, to the effect that corporate stock shall be issued to them without receipt by the company of money or property equivalent in value to the par value of the stock, is void because contrary to the spirit and policy of the act.

6. Under the General Corporation act of 1875 (*1 Gen. Stat. p. 907 §§ 5, 54, &c.*) a creditor's knowledge that stock was improperly issued as "full paid" and as "issued for property purchased," when the fact was otherwise, is not sufficient to debar him from relief against the recipients of the stock.

7. A stockholder who participated actively in a transaction that resulted in an improper issuance of stock as "issued for property purchased," and himself received a part of such stock—*Held*, not estopped from participating as a creditor in proceedings taken to enforce the liability of delinquent stockholders by the circumstance that their stock certificates were marked "full paid" and "issued for property purchased," since the stockholders knew the fact to be otherwise.

8. One who participates as a stockholder and officer in an improper issuance of stock certificates marked "full paid" and "issued for property purchased," is not debarred by operation of the maxim *in pari delicto potior est conditio defendentis* from enforcing against the stockholders any just claims he may have as a creditor of the company. The agreement for improper issuance of the stock being absolutely void on grounds of public policy, his rights as a creditor remain unimpaired.

---

On appeals from a decree of the court of chancery, advised by Vice-Chancellor Bergen, whose opinion is reported in *69 N. J. Eq. 326.*

*Mr. Sylvester C. Smith* and *Mr. R. C. Stewart* (of the Pennsylvania bar), for the appellants.

*Messrs. Guild & Martin,* for the respondent Henry A. Potter.

*Mr. Richard V. Lindabury,* for the respondents Elisha P. Wilbur and Fidelity Trust Company, executor, &c., of Edward M. Paxson, deceased.

The opinion of the court was delivered by

PITNEY, J.

In the winding up of the American Brick and Tile Company as an insolvent corporation, the appellant Frederick Green, in

his individual right, presented to the receiver a sworn claim for moneys loaned by him to the company, amounting, with interest, to $6,655, and in his capacity as executor of his father, Henry Green, deceased, presented a sworn claim for moneys advanced by the latter in his lifetime showing a balance due of $22,947.88, besides interest. In a proceeding instituted by the receiver against certain stockholders for enforcement of their liability for unpaid subscriptions, the learned vice-chancellor, while upholding the right of the receiver to recover for the benefit of other creditors (and in this his decree has just been affirmed by this court), held that the Green claims were not properly chargeable against the delinquent stockholders. From this part of the decree the present appeals are taken.

The grounds upon which the vice-chancellor decided against the Green claims were that Henry Green was a director in and the president of the defendant corporation, and Frederick Green was its secretary and treasurer at the time the stock found to be unpaid was issued; that each of them, at the time they became creditors, knew the exact condition of the company, and knew that the stock in question was not issued for property at its value, as it purported to be. He held that the right to hold subscribers for unpaid balances on account of stock issued depends entirely upon the fact that the stock was issued fraudulently as to creditors, and that in the present case, if it was so issued, it was by act of the directors, including Henry Green, and with the knowledge of the treasurer, Frederick Green, and that they each extended credit to the company, with notice that the stock was not full paid, and that the company had entered into a contract with its stockholders that no further payments would be required.

Before dealing with this matter, some questions of practice require to be disposed of. First, it is insisted that the present appeals are not properly taken and ought to be dismissed, and this on the ground that Frederick Green, either individually or as executor, was not a party to the proceeding in the court below, except so far as he appeared in his capacity as executor resisting the claim of the receiver to hold Henry Green's estate liable for

the unpaid subscription upon his stock. It is true, as pointed out by counsel, that so far as the Green claims are concerned, they were represented in the proceedings below solely by the receiver, who filed his petition in their behalf as well as in the behalf of other creditors. It is, however, obvious that the present appellant, both in his individual and in his representative capacity, is directly concerned in the decree so far as it denies relief with respect to his claims, and he is therefore in a substantial sense a party aggrieved. Promptly after the filing of the decree he entered notices of appeal, and in due season filed petitions of appeal in this court. Answers were filed to these petitions, and in the answers no question was raised of his right to appeal. If the objection that is now raised had been promptly taken he could have intervened formally as a party, or have applied to the receiver to enter an appeal in his interest. The objection to the form of the procedure having been withheld until the appeals were brought on here for final argument, the matters at issue will be determined upon the merits, and the proceeding amended, if necessary, in such a manner as to support the status of the appellant.

It is next insisted that the Frederick Green claim is wholly barred by the statute of limitations, and that the Henry Green claim is likewise thus barred, with the exception of items aggregating $2,300. The insistment is that, with this exception, all the loans and advances in question were made more than six years before the filing of the bill in the insolvency matter, and that certain payments on account thereof, proved to have been made within the six years, were made under such circumstances as not to evidence a new promise by the company. Upon the evidence that is before us, there would seem to be some question whether the claims are not barred by the statute. But can the respondents be permitted, here, to raise the question? The receiver's petition filed in the court below against the delinquent stockholders, among whom were the present respondents, sets forth sundry claims that had been presented to him against the company, and among them the above-mentioned claims of the appellant, averring that he had accepted and admitted them as claims against the corporation. The present respondents sever-

ally answered the petition, and in their answers neither admitted nor denied the truth of this averment, leaving the petitioner to make proof thereof. The answers of Wilbur and Paxson set up that inasmuch as Henry Green procured the company to be organized, and, as a member of the board of directors and president of the company, took part in the purchase of the patents and patent rights and the issue therefor of the capital stock, and himself caused the certificates to be issued as. for property purchased, he and his executor were estopped from alleging that the stock was not fully paid and non-assessable. And as to the claim of Frederick Green in his own behalf, they set up that the claim was contracted by him with full knowledge that all the capital stock had been issued either for cash or for property at par. Beyond this they did not challenge the Green claim.

Each of these answers contained this further averment:

"This respondent further says that any liability that may be asserted against him as the holder of stock of said corporation cannot be based upon any contractual obligation upon his part, but only a statutory liability in favor of creditors, and that the claimants are now precluded by their laches and by the statute of limitations from asserting or enforcing the same."

The effect of this is clearly to raise the bar of the statute of limitations only with respect to the stockholders' liability to contribute unpaid stock subscriptions for the benefit of creditors, a ground that is not now pressed. The answers contain no averment invoking the statute as a bar to the validity of any of the creditors' claims as against the company.

The answer of Potter did not in anywise challenge the Green claims, nor raise any question of the statute of limitations.

Subsequently Judge Paxson filed a petition averring himself aggrieved by the proceedings and determination of the receiver in allowing the said several claims, and appealing to the chancellor from the allowance of the claims and of each of them, but without setting up any matter of defence to the claims.

In this state of the pleadings the matter came on for hearing before the vice-chancellor upon the petition of the receiver

for relief against the stockholders and the answers thereto. At the beginning of the hearing counsel for Judge Paxson and Mr. Wilbur stated to the court that doubts had arisen in the minds of counsel whether a full inquiry into the claims presented could be made under this proceeding, although, as he said, the answers challenged the claims. In the language of counsel:

"It is said that they were outlawed and presented too late and other defences set up, such as the want of authority on the part of the corporation to contract some of the debts or claims: these are questions that go to the validity of the claims altogether, and while it may be true that parties, against whom this assessment is asked, would have the right to challenge those claims in this proceeding and to deny their validity for any purpose, yet, I think, it would be more in accordance with the practice of the court if they should appeal from the allowance of the claims by the receiver."

To this counsel for the receiver responded, objecting that the time for such appeal had gone by, but submitting it to the discretion of the court ·to allow an appeal. The learned vice-chancellor thereupon announced that he would permit the creditors to first prove their claims as if appeals had been filed, and the parties then proceeded with their proofs—first to establish the validity of the creditors' claims as against the company and afterwards to establish the liability of the stockholders for unpaid subscriptions to capital.

It is clear, we think, that in this informal method of proceeding the only questions that can be deemed as having been raised for determination by the vice-chancellor respecting the validity of the claims are the questions that were raised by the answers of Wilbur and Paxson to the receiver's petition. The statement of counsel just quoted had the effect of referring the court and opposing counsel to the answers for a specification of the grounds of his opposition to the affirmance of the claims. Those grounds did not include the bar of the statute of limitations as between the creditors and the company.

The statutory bar must be specially pleaded unless the facts that raise it appear to be admitted, which is not the case here. *Brand* v. *Longstreet, 4 N. J. Law (1 South.) 325; Gulick* v.

*Loder, 13 N. J. Law (1 Gr.) 68; Partridge* v. *Wells, 30 N. J. Eq. (3 Stew.) 176; 31 N. J. Eq. (4 Stew.) 362.*

And indulgence will not be granted to a party who fails in due time and proper form to invoke the protection of the statute. *West Hoboken* v. *Syms, 49 N. J. Law (20 Vr.) 546.*

The proof is clear that the claims in question are just and true, and that they remain unpaid. Simply because the proofs as taken tend to indicate that they were in whole or in part barred by the statute, we cannot assume that such is the fact, for the claimants were not called upon to produce such evidence as they may have possessed to show the contrary. Under the circumstances we think the delinquent stockholders cannot be heard in this court to set up the bar of the statute as against the validity of the claims.

This brings us to a consideration of the grounds upon which the learned vice-chancellor denied the receiver's prayer for relief so far as the Green claims are concerned. There is a line of reported cases holding that stockholders who participate or aid in the issue of paid-up stock upon payment of less than its par value, or who have knowledge of the act and acquiesce therein, cannot afterwards complain of the transaction, either as stockholders or as creditors. Some of these are cited in *Cook Stock.* § 39, referred to in the opinion of the vice-chancellor. Others will be cited below. So far as we have observed, however, all well-considered decisions that adopt this doctrine are based upon general principles of equity, in the absence of any controlling statute or public policy, resort being had alone to the "trust fund theory" as a basis for the stockholder's liability to creditors. The theory of these cases is that, as between the stockholder and the company, there is no absolute liability to pay for his stock in full, and no legal prohibition standing in the way of an agreement that the stock shall be issued to him for less than full payment. An agreement to this effect is therefore treated as valid between the parties, and subject to avoidance only at the instance of those creditors who have been defrauded by their reliance upon the stock issues as representative of capital actually paid in to the company.

The "trust fund theory" has been repeatedly adopted by the courts of this state to the extent that it deals with the capital stock paid in or subscribed for as a fund for the payment of debts of which the directors are trustees, so that they cannot dispose of it to the prejudice of creditors without an equivalent consideration, nor defeat the trust by accepting any simulated payment of a stock subscription, or by any other device short of actual payment in good faith. *National Trust Co. v. Miller, 33 N. J. Eq. (6 Stew.) 155, 163; Wetherbee v. Baker, 35 N. J. Eq. (8 Stew.) 501, 512; Bickley v. Schlag, 46 N. J. Eq. (1 Dick.) 533, 537.*

But so far as this so-called "trust fund doctrine" excludes any creditors from relief against the stockholders, it does so on the theory that the liability of the latter rests alone upon their having held out the capital of the company to persons extending credit to it as the source from which repayment might be expected. If this be the only foundation of the stockholder's liability, it is perhaps not irrational to debar creditors whose claims accrued prior to the stock issue in question, and subsequent creditors who had notice when they extended credit that the stock issue did not represent in whole or in part what it purported to represent—that is, an equivalent amount in value added to the assets of the company.

But in this state the stockholder's liability to creditors does not depend alone or chiefly upon the theory of "holding out." It depends upon the stockholder's voluntary acceptance, for consideration touching his own interest, of a statutory scheme to which watered stock, under whatever device issued, is absolutely alien, and which requires stock subscriptions to be made good for the benefit of creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none. The corporation now under consideration was organized in 1886, under the General Corporation act of New Jersey as it then stood—that is, the act of 1875 and its supplements. *Rev. 1877 p. 175; 1 Gen. Stat. p. 907.* Section 5 of this act declares that

"where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy the claims of its creditors, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share, as fixed by the charter of the company, or such proportion of that sum as shall be required to satisfy the debts of the company."

Section 54 declares:

"that nothing but money shall be considered as payment of any part of the capital stock of any company organized under this act,, except as hereinafter provided for the purchase of property, and no loan of money shall be made to a stockholder or officer therein," &c.

Section 55 provides for the issuance of stock for property ·purchased, to the fair value ·of such property, but as it has already ·been determined that this section was not complied with in the present case, it need not be quoted here. Other sections (7, 33, 53, &c.) contain provisions intended to prevent the withdrawal by stockholders, directly or indirectly, of any part of the capital stock to the detriment of creditors.

The express prohibition of section 54 and the whole spirit and policy of the act are so clearly opposed to any arrangement by which corporate stock shall be issued without receipt by the company of an equivalent in value to its par that any agreement to this effect must be deemed void as contrary to the policy of the law. If any doubt has existed upon this question it must be taken as settled by the decision of this court in *Volney* v. *Nixon,* *68 N. J. Eq.* ₁*605.*

Nor do we deem that the weight of authority in other jurisdictions is to the contrary of this. As already remarked, those cases which are apparently opposed proceed upon a view of the equitable rights of the parties as they exist in the absence of express statutory mandate or prohibition. Of the decisions cited in the briefs of counsel, the following will be briefly discussed:

In the federal courts, the trust fund doctrine seems to have been first declared in an opinion delivered by Judge Story at the circuit. · *Wood* v. *Dummer (1824), 3 Mas. 308, 311.*

The doctrine was recognized by the United States supreme court in *Sawyer* v. *Hoag (1873), 17 Wall. 610, 620.* In this case, Sawyer, having subscribed for $5,000 of stock in a com-

pany, undertook to pay for it by giving to the company his
check for the full amount, taking back, at the same time, the
company's check for $4,250, for which latter amount he gave
his note to the company, payable in five years, with good col-
lateral security.   Mr. Justice Miller, who delivered the opinion,
said, *arguendo,* that this transaction, if nothing unfair was in-
tended, was one that the parties could do effectually, so far as
they alone were concerned, and he said:  "In any controversy
which might grow out of the matter between the company and
Sawyer we are not prepared to say that the company, as a cor-
porate body, could deny that the stock was paid in full."   The
company having become insolvent, however, it was held that
Sawyer was liable to pay the note in money as representing the
balance of his unpaid subscription, the court denying his right
to set off a claim against the company that he had bought from
another creditor.   It will be observed that what was said about
the propriety of the transaction as between Sawyer and the
company was unnecessary for the decision.   Moreover, the char-
ter of the company expressly authorized it to begin business
upon payment of one-tenth of its capital, the residue to be
secured, so that Sawyer's subscription was secured substantially
in accordance with the charter.

The case of *Scovill* v. *Thayer (1881), 105 U. S. 143,* is a
clear illustration of the relation of the "trust fund theory" to
the more positive rules of law that depend upon express statu-
tory enactments.   Here a corporation, organized under the laws
of the State of Kansas, had commenced with $100,000 capital,
and had undertaken to successively increase its capital—first,
to $200,000; then to $300,000, and afterwards to $400,000.
Thayer, who held stock of each of the first two issues, attended,
by proxies, the meetings of the stockholders at which the third
and fourth issues were voted, and he became a holder of a part
of each of those issues.   None of his stock was paid up by him
in full, and the company having become insolvent, the assignees
in bankruptcy petitioned for an assessment against the stock-
holders, including Thayer.   He insisted—*first,* that the third
and fourth issues of stock, having been made in excess of the
limit of capital prescribed by the laws of Kansas, were abso-

lutely void, and that no assessment could be made against him by reason of his holding shares of those issues; and *secondly,* that the sums voluntarily paid by him upon his void stock should be applied to the payment of the balance due upon his valid stock. The court held that the third and fourth issues were in excess of the limit prescribed by law and therefore void, and that notwithstanding Thayer's assent to those issues, and the fact that after such increase the company had held itself out as possessing a capital of $400,000, and invited and obtained credit on the faith of such representations, he was not estopped from denying the validity of this stock and his obligation to pay for it in full. With respect to his valid stock, it appeared that by the agreement between him and the company he was not to be called upon to pay any further assessments upon it, the same contract being made with all the other shareholders and the fact being known to all. The court held that as between them and the company this was a valid agreement, since it was "not forbidden by the charter or by any law or public policy." It is entirely clear that if there had existed in Kansas any prohibition similar to that contained in our Corporation act, the court would have reached a different conclusion upon the latter question.

In *Coit* v. *North Carolina Gold Co. (1882), 14 Fed. Rep. 12; affirmed (1886), 119 U. S. 343,* Mr. Justice Bradley, sitting in the circuit court, held that where for the purchase of additional property the capital of the company had been increased by the issue and distribution of new stock to a much larger extent than the cost or value of the property, the stockholders could not be held individually liable at the suit of a creditor who was cognizant of the whole transaction and acquiesced in it. The decision was affirmed by the supreme court, Mr. Justice Field delivering the opinion, saying *(119 U. S.,* at *p. 347)* "the plaintiff had placed no reliance upon the supposed paid-up capital of the company on the increased shares, and therefore has no cause of complaint by reason of their subsequent recall. Had a new indebtedness been created by the company after the issue of the stock and before its recall, a different question would have arisen. The creditor, in that case, relying on the

value of the stock being fully paid, might have insisted upon its full payment. But no such new indebtedness was created, and we think, therefore, that the stockholders cannot be called upon, at the suit of the plaintiff, to pay in the amount of the stock which, though issued, was soon afterwards recalled and canceled." But here, again, the case turned upon the general principles of equity, no statute being cited that prohibited the issuance of stock without payment in full in money or money's worth.

*Clark* v. *Bever (1891), 139 U. S. 96,* is a case of somewhat similar character, the court (at *p. 108, &c.*), in terms, placing its decision upon the absence of a statute disabling the corporation from disposing of its stock at less than par, and in the syllabus the circumstance that there was no statute forbidding the transaction that was under attack is made prominent.

In *Handley* v. *Stutz (1891), 139 U. S. 417,* it was held that when a stockholder who assents to an increase in the capital stock and its gratuitous distribution among the shareholders receives such stock as full-paid stock, an obligation arises to pay for it in full when called upon to do so by creditors whose debts are subsequent to the authorization of the increase, but that this equity does not exist in favor of a creditor whose debt was contracted prior to such authorization—and this on the ground (*p. 435*) that prior creditors could not be presumed to have trusted the company upon the faith of the increased stock.

*Dickerman* v. *Northern Trust Co. (1900), 176 U. S. 181, 203* (a case arising under our Corporation act of 1875), contains a *dictum* by Mr. Justice Brown to the effect that as between the corporation and its stockholders a declaration upon the face of the certificate that the shares are fully paid and unassessable is binding, although untrue. The learned justice quotes from *Scovill* v. *Thayer* to the effect that such an arrangement was "not forbidden by the charter or by any law or public policy," apparently overlooking that what might be true of the Kansas statutes was not true of the Corporation law of New Jersey.

*Rickerson Roller Mill Co.* v. *Farrell (1896), 75 Fed. Rep. 554, 560,* holds simply that *"in the absence of statutory or charter provisions"* a corporation may agree with a subscriber to its

stock to receive less than the par value therefor, and that a creditor of the company who becomes such with knowledge of such an agreement cannot require the subscriber, upon the insolvency of the corporation, to pay his stock in full. The words in italics indicate the limitations of the decision.

*First National Bank* v. *Gustin, &c., Mining Co. (1890), 42 Minn. 327; 44 N. W. Rep. 198; 6 L. R. A. 676; 18 Am. St. Rep. 510.* In this case the supreme court of Minnesota had to do with the individual liability of a shareholder in a corporation organized under the laws of Dakota. The code of Dakota provided that each stockholder should be individually liable for the debts of the corporation to the extent of the amount that was unpaid upon the stock held by him, but seems to have contained no express prohibition against the issuance of stock for less than its par value. It was held that where a corporation, with which a creditor had dealt with knowledge that its nominal paid-up capital was not in fact paid, issues new shares after the claim of the creditor arises, he has no right to insist upon a contribution from the holders of those shares. Justice Mitchell said: "The whole doctrine that the capital stock of corporations is a trust fund for the payment of creditors rests upon the equitable consideration that the distribution of the capital among stockholders, without making adequate provision for the payment of debts, or the issue of fictitiously paid-up stock, is a fraud upon creditors who contract with the corporation in reliance upon its capital remaining intact, or in reliance upon the professed capital having been in fact paid up in full. But when the reason for the rule does not exist, the rule itself ceases to apply. This trust does not arise absolutely in every case in favor of every and any creditor," &c.

*Hospes* v. *Northwestern Manufacturing Co. (1892), 48 Minn. 174; 50 N. W. Rep. 1117; 15 L. R. A. 470; 45 Alb. L. J. 277; 36 Am. & Eng. Corp. Cas. 206; 31 Am. St. Rep. 637.* This is another decision by the same judge who wrote in the case last cited. The corporation in question was organized under the laws of Minnesota. It was held that if stock is issued by such a corporation upon a contract that it shall not be paid for, its

creditors cannot recover payment for such stock on account of the implied promise of the persons receiving it that such payment will be made. Manifestly such a decision could not properly be reached with respect to any corporation organized under the New Jersey law. The opinion contains an interesting criticism of the "trust fund doctrine," resulting in what seems to be its virtual repudiation. As showing, however, that the doctrine, where recognized, must give place to an express statutory provision, the following excerpt from the opinion is instructive: "In England, since the act of 1867, there is an implied contract created by statute that 'every share in any company shall be deemed and be taken to have been issued and to be held subject to the payment of the whole amount thereof in cash.' This statutory contract makes every contrary contract void. Such a statute would be entirely just to all, for everyone would be advised of its provisions and could conduct himself accordingly. And in view of the fact that 'watered' and *'bonus'* stock is one of the greatest abuses connected with the management of modern corporations, such a law might, on grounds of public policy, be very desirable. But this is a matter for the legislature, and not for the courts. We have no such statute."

We do not wish to be understood as assenting to the reasoning of the foregoing cases so far as they debar from recourse to the stockholder's liability those creditors whose claims accrued before the stock issue in question, and those subsequent creditors who extended credit to the company with knowledge that the stock was issued as full paid when it was not full paid in fact. With respect to prior creditors, the query arises, Why may they not resort to after-acquired property of the company, and as well stock subscriptions as more tangible assets? With respect to subsequent creditors, the query is, Why, if they knew the stock issued as full paid was not full paid in fact, may they not be justified in dealing with the very stockholder's liability thus arising as a part of the assets of the company for the purpose of satisfying creditors' claims? But without spending time in discussion of these questions, we content ourselves with saying that our Corporation act places the stockholder's liability to creditors upon a firmer foundation than the "trust fund doctrine" as

expounded in the above cases, the statute absolutely prohibiting agreements for the issue of stock for a consideration less than its par value, and affording relief to all creditors without distinction.

As to the status of Frederick Green in the case before us, the evidence does not satisfy us that he participated in the arrangement for the issuance of this stock for the patents. He was secretary and treasurer of the company, and signed the certificates, but he appears to have done this as a ministerial officer, by the direction of the president. There is nothing, therefore, to bar his individual claim save that he had notice of the fact that the stock was issued as full paid for property purchased. As already shown, such notice is not sufficient to debar him.

As to the claim of Henry Green, he, of course, did participate actively in the transaction that resulted in the improper issuance of the stock in question, and he received a part of the stock himself. But there is nothing to show that he intended any actual fraud upon his fellow stockholders, Messrs. Wilbur, Paxson and Potter, upon whom (together with the Henry Green estate) the decree under review fixes a liability for unpaid subscriptions. There appears to have been a perfect understanding among these gentlemen, and there is much in the evidence to indicate that they expected, if they did not actually agree between themselves, to contribute, not merely $10,000 each, but whatever additional sums might be needed to exploit the patents and put the company upon a paying basis, and that, in the event of failure, they would wind up the enterprise and pay the company's debts, if any, out of their own pockets. Such an understanding would be quite consistent with the legal obligation that was assumed by them when they subscribed to the articles of association and accepted the stock. We do not believe that at that time it was at all contemplated that any creditor of the company would be permitted to remain unpaid. Judge Green was, by common consent, permitted to assume and exercise the entire management of the concerns of the company, all parties being at the time sanguine of its ultimate success. The moneys that he loaned to the company were advanced for the general benefit of the stockholders, including himself. They are a just and lawful

claim as against the company, and not an inequitable claim as against the delinquent stockholders.

His estate cannot be debarred on the ground of estoppel, for his associates, who are now disputing their individual liability to pay, were not at all misled by the circumstance that their stock certificates were marked "full paid" and for "property purchased" since they knew the fact to be otherwise.

Nor is the Green estate debarred by the operation of the maxim *in pari delicto potior est conditio defendentis.* If it were seeking any advantage out of the unlawful agreement, this maxim would apply. But that agreement being absolutely void on grounds of public policy, his rights as a creditor for moneys actually advanced remain unimpaired. *Cone* v. *Russell, 48 N. J. Eq. (3 Dick.) 208, 217,* and cases cited; *Delaware, Lackawanna and Western Railroad Co.* v. *Trautwein, 52 N. J. Law (23 Vr.) 169; Newbury* v. *Luke, 68 N. J. Law (39 Vr.) 189.*

As against the delinquent stockholders, therefore (including, of course, the Henry Green estate as one), both the Green claims are entitled to payment. Payment of the Henry Green claim should, of course, be deferred until his estate contributes its proper portion of the amount necessary to satisfy the decree.

Whether either or both of the Green claims ought to be postponed to the claims of the other creditors (the Easton National Bank and Henry Short), who had no connection with the internal management of the company, is a question not fairly presented by the present record. It will be left for future determination, if necessary.

So far as the decree debars the Green claims from participation in the fund, and limits the recovery against the delinquent stockholders to the amount that would be necessary to satisfy the claims other than the Green claims, it will be reversed and the cause remitted for further proceedings in accordance with the views above expressed.

*For affirmance*—HENDRICKSON, VROOM—2.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, GARRETSON, PITNEY, SWAYZE, REED, BOGERT, VREDENBURGH, GREEN, GRAY, DILL—11.