## THE EASTON NATIONAL BANK

### *v.*

## THE AMERICAN BRICK AND TILE COMPANY.

[Decided February 16th, 1905.]

1. Under the Corporation act of 1875, authorizing the issue of full-paid stock for the purchase of property, and requiring such stock to have stamped upon the face thereof the words, "issued for property purchased," the issue, in exchange for property, of full-paid stock, stamped as required, constitutes a contract which will prevent an assessment of the stockholders, until and unless it is set aside as an agreement in fraud of creditors.

2. The proper course to obtain relief is by bill to have the contract set aside and the delinquent stockholders decreed to pay a sufficient proportion of all unpaid subscriptions to satisfy the liabilities of the company.

3. In the absence of actual fraud, the overvaluation, by the directors, of property taken in exchange for stock, does not render the transaction fraudulent as against creditors.

4. Any device by which the stock of a corporation passes to a stockholder as full paid, without payment in full, either in cash or property purchased, to the amount of the value of the stock, such as an intentional overvaluation of property on the understanding that a portion of the stock issued shall be returned for distribution among the directors voting for a purchase of the property, without payment by them, constitutes actual fraud against the creditors of the corporation.

5. *Bona fide* transferees of stock certificates which recite that the stock is full paid, are not bound to make good to creditors the contract

of the original subscribers to pay for the stock in full, according to its par value, where they have no knowledge or notice that the subscribers have not paid in full.

6. Creditors of a corporation who knew that stock issued as full paid was not in fact full paid, and nevertheless extended credit to the corporation, cannot, in the event of its insolvency, require the stockholders to pay their unpaid subscriptions.

On bill, &c. On final hearing.

*Mr. George M. Shipman,* for William M. Davis, receiver.

*Mr. W. S. Kirkpatrick* (of the Northampton county bar, Pa.), for the Easton National Bank, a creditor.

*Mr. Richard V. Lindabury* and *Mr. Samuel Dickson* (of Pennsylvania), for Edward M. Paxson, Charles A. Mayer and E. P. Wilbur, individually, defendants.

*Mr. R. C. Stewart* (of the Northampton county bar, Pa.), for Frederick Green, individually, and as executor of the estate of Henry Green, deceased.

*Mr. W. H. Walters* and *Mr. E. J. Fox* (of the Pennsylvania bar), for the Easton Trust Company, Mary B. Knight, executrix, and Samuel W., William H., Elizabeth, Fletcher H. and R. S. Knight.

*Mr. J. H. Thayer Marlin,* for Henry A. Potter.

*Mr. James Buchanan,* for E. P. Wilbur Trust Company and Lehigh Valley National Bank.

*Mr. H. M. Hagerman,* for Henry Short, a creditor.

BERGEN, V. C.

Upon the filing of the original bill in this cause the defendant was decreed to be an insolvent corporation, and William M. Davis was thereupon appointed receiver of the same under the

law of this state, and, qualifying, gave the proper notice to creditors; sundry claims were presented, and finding no assets of the company, other than the obligations of the subscribers to the capital stock of the defendant corporation for alleged unpaid subscriptions, he filed his petition praying that an order be made directing an assessment against the holders of such stock to the extent required for the satisfaction of the debts of the company. All stockholders were duly notified and have answered the petition denying their liability, and have also appealed from the order of the receiver allowing the claims of the creditors. The evidence on the hearing disclosed the fact that all the stock was issued by the company as full paid, and had stamped upon it the statement that it was issued for property purchased. I am satisfied that the stock, in the form in which it was issued, constituted a contract between the company and its stockholders which would prevent an assessment until that contract was set aside as an agreement in fraud of creditors; also that no such order can be properly made under these proceedings, and that the proper course is by bill to have the contract set aside, and the delinquent stockholders decreed to pay a sufficient proportion of all unpaid subscriptions to satisfy the liabilities of the company, but as all the evidence necessary to settle the questions that would be raised by such a bill has been taken, and counsel for all parties having on the hearing expressed their desire to have the controversy determined, I shall permit the petitioner to amend his petition, making it a bill of complaint, and thus present the issues raised to which the testimony, which is quite voluminous, was directed, and the answers filed will be taken as answers to that bill of complaint.

The corporation was organized under the Corporation act of 1875 (*Rev. 1877 p. 174*), by the terms of which stock was issuable for the purchase of property to the "amount and value thereof," and when so issued

"shall be declared and taken to be full-paid stock, and not liable to any further call; neither shall the holder thereof be liable for any further payments under any of the provisions of this act, and said stock shall have legibly stamped upon the face thereof the words, 'issued for property purchased.' "

It will be observed that this differs from the law of 1896, in that the later act does not require stock issued for property to have stamped upon it the statement that it was issued for that purpose, but makes the judgment of the directors conclusive as to value in the absence of actual fraud. This change has no other effect than expressing what our courts had already determined in construing the earlier legislation, for in *Bickley* v. *Schlag, 46 N. J. Eq. (1 Dick.) 533,* the court of errors and appeals held that if the transaction was not fraudulent the difference in value between the property and the stock had no legal significance, and cited with approval *Coit* v. *Gold Amalgamating Co., 119 U. S. 345,* where the court said: "But where full-paid stock is issued for property received there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account." The question now presented is, did these defendants, in issuing the whole capital stock of the company, representing at par $1,000,000, in payment for patents assigned to the company, commit an actual fraud upon the subsequent creditors of the corporation? The expression "actual fraud," as used in the cases last mentioned, must be interpreted to mean and include any device by which the stock of a corporation passes to a stockholder without payment in full, either in cash or by property purchased, "to the amount of the value thereof," and that an intentional overvaluation of property, upon the understanding that a portion of the stock issued should be returned for distribution among the directors voting for the purchase without payment by them, is such a device, and falls within the definition of "actual fraud" as intended by the court of errors and appeals.

The minutes of this corporation contain no record of the determination of the board of directors to purchase the patents and to issue all of the capital stock in payment therefor, and it is sought by the testimony of witnesses to show such action, but the effort resulted in an utter failure, no proof sufficient to warrant a judicial finding of such a fact being offered. Chief-Justice Paxson, in undertaking to state his recollection on this point, said "a certain amount of this stock was to be issued to the patentees, and the balance of the stock was to be issued to

those gentlemen who agreed to put in some money for the purpose of operating under the patents." Elisha P. Wilbur said: "I can only remember that a certain amount of stock was to be given to these gentlemen for their patents," but he was unable to state how much was to be issued for patents and how much for cash. Henry A. Potter does not recall where the meeting was held, nor anything more than the purport of the resolution, which was to issue the stock "for the possible value of the patents."

These are all the parties testifying to this resolution, a resolution disposing of $1,000,000 of property, the contents and purport of which depend upon the recollection of busy men engaged in large and most important enterprises given nearly seventeen years after its adoption, none of them being able to state where this meeting was held, and their recollection of the persons present is very indistinct and unsatisfactory. This evidence does not satisfy me that there was distinct official action by the directors fixing the value of the property and determining that all of the capital stock should be issued to the patentees in payment for their patents. On the contrary, I am of the opinion that no official action was taken, and that with the exception of informal meetings and perhaps general conversations with Judge Green, the carrying out of the negotiations with the patentees was confided entirely to Judge Green; that the expectation of the parties was that he would in some way arrange matters, so that for the $10,000 each had advanced stock would be issued to them which, at par, would be greatly in excess of that sum, and that they never expected that if all of the stock was issued for patents, it would be retained by the patentees, for under the view insisted upon, that all of the stock was to be issued for the patents, nothing would remain for those who had contributed towards the incorporation of this company, and this belief finds support in the fact that at the time Judge Green held a contract with the patentees as to the distribution of this stock to which I shall hereafter refer.

If we should accept the claim of these defendants that there was a meeting of the board of directors, at which it was voted to issue all of the stock for the patents, I am yet of the opinion

that the proceeding was a device to issue to these directors stock
for which they had not and did not expect to pay in "money or
money's worth," and that to accomplish this there was an inten-
tional overvaluation of the patents, which, as against creditors,
was such a fraud as a court of equity should discountenance.

· There is, however, another view to be taken of this case, which
is equally fatal to the defence interposed, and that is, that it was
never intended to issue all of the capital stock in payment for
the patents. It clearly appears that prior to the organization
of the company Judge Green had entered into a written con-
tract with the patentees, bearing date March 12th, 1886, in
which, after reciting that Lenox Simpson and M. P. Canfield
having acquired the ownership of letters-patent for making
bricks from slate refuse, it was proposed to form a corporation
for the purpose of putting the patent to use, and that Judge
Green was willing to undertake the placing of the stock upon
such terms as might be agreed upon between him and the pur-
chasers thereof, it was agreed that such corporation should be
formed with a capital of not less than $1,000,000; that upon
the payment by Judge Green into the treasury of the company
of $20,000, and to Simpson & Canfield $5,000, he should be
entitled to six-tenths and Simpson & Canfield, upon transfer-
ring to the corporation their patents, should have the remain-
ing four-tenths. It was further stipulated that Simpson & Can-
field should pay into the treasury of the company stock of the
par value of $55,000, to be used for sale to raise working capital,
and that Judge Green should deliver to them $20,000 at par
of the stock retained by him. It nowhere appears that the part
of the agreement relating to the deposit of stock was ever car-
ried out; on the contrary, when the stock was issued, Simpson
& Canfield, by a release in writing dated September 29th, 1887,
discharged Judge Green from further compliance with the con-
tract in consideration of the issue to them of four thousand two
hundred shares of stock, and the payment by Green of $5,000
into the treasury of the company, so that the actual price paid
by Judge Green for the patents was four thousand two hundred
shares of stock, more than one-half of which afterward came

into the hands of Judge Green, the reason or consideration therefor not appearing.

The reason for the basis upon which the stock was issued by Judge Green to his associates was not shown, but the fact that each was assigned one thousand five hundred shares, just one-fourth of the six-tenths allowed to Judge Green under the contract, justifies the inference that he was giving to each an equal proportion of the benefit of his contract with the patentees, and this is supported by the statement of Mr. Potter, who testifies, "I was to be equal with Judge Green," and also that he knew of the contract and its terms. The conclusion to be drawn from the evidence is irresistible that these incorporators knew that sixty per cent. of the capital stock was to be issued to them in equal portions, representing a par value of $150,000 each, for which they paid only $10,000, nor was the formality of issuing the stock to Judge Green observed, the record showing that the first issue was to the incorporators, from which it is fair to infer that Judge Green was the agent of the parties, and that they had full knowledge of the situation. I am therefore of the opinion that the issue of this stock as full paid, while good as between the parties to it, was a contract made by the company with its stockholders in derogation of the rights of creditors, which should be set aside, and the holders of the stock decreed to pay on account of their holdings, in addition to what they have paid in cash, a sum sufficient to liquidate the debts of the company.

The conclusion I have reached disposes of the rights and settles the liabilities of the original subscribers, but the receiver insists that those stockholders who purchased shares of this stock from Judge Green are equally liable with those who subscribed and to whom the stock was first issued, and seeks to maintain the doctrine that the transferee of stock, issued in payment for property at an intentional overvaluation, is liable to make good the subscription to the extent required to satisfy creditors, even where the stock certificate contains a statement that the stock was issued for property purchased and is full paid, the purchaser having in good faith relied upon such state-

ment without notice of the conditions under which the stock was issued, or of any fact which should put him on inquiry.

The defendants affected by this question are Samuel, William H., Fletcher H., Elizabeth and R. S. Knight, legatees of John T. Knight, deceased, estate of R. P. Lindermann, W. A. Wilbur, C. A. Mayer and the estate of P. W. Sheafer.

By a statement of the capital stock account in the handwriting of Judge Green, the president of the corporation, no stock ledger having been kept other than this statement, it appears that all the shares held by the above persons were transferred to them by Judge Green, presumably from stock originally issued to the patentees for property purchased, which in some way not disclosed came to Judge Green, who sold the stock to the foregoing parties and applied the proceeds of the sales to his own use, for the cash account of the corporation contains no entry showing that it ever passed into the treasury of the company. The books of this company contain very little information upon which we may safely rely, but the presumption that the sales were made from stock, other than that originally issued to Judge Green, is justified by the fact that the original amount of stock, one thousand seven hundred and fifty shares, issued to him, still stands in his name. The stock sold and transferred by Judge Green was issued as full paid, stamped with the statement that it was issued for property purchased, and there is no evidence in the cause showing any knowledge upon the part of these transferees that it was not what it purported to be, full paid, and under the law permitting its issue, free from any liability to further assessment. It was urged on the argument that these parties having recognized an assessment of four dollars per share, by paying some of them in full and others in part, thereby admitted that the stock was not full paid, from which it is fair to assume they knew when they purchased that their stock was under paid, but I am satisfied from the evidence that these payments were voluntary, made for the purpose of providing additional funds for the company, and that the assessment was a plan adopted for the purpose of equitably distributing the burden, rather than the assertion of a right, for the resolution provides that if the payments are

not made treasury stock shares be sold to raise the shortage, and it is quite clear that the money was needed to protect their investments.

The liability of transferees for assessments on account of unpaid stock has been the subject of much consideration by the courts of this country, resulting in radical differences of opinion, but in my judgment the weight of authority and sound reason support the view that a *bona fide* transferee of stock, the certificate for which recites that it is full paid, is not liable to make good the contract of the original subscriber if the transferee has no knowledge that the subscriber has not paid in full, nor notice of any fact from which knowledge may be inferred, or which requires him to inquire as to the truth of such statement.

The right to hold a stockholder for an unpaid subscription, in the interest of creditors, rests upon the doctrine that the capital stock is a trust fund for the payment of the obligations of the company, and that the subscription creates a debt due to the corporation upon which a creditor may rely and which the company cannot remit to his injury. The contract between the corporation and the subscriber is, that for the stock issued he will make full payment, and any attempt to avoid this, by waiver or other device, will not excuse the subscriber to the injury of the creditor, but there is no equitable reason why the creditor should be allowed to shift the right he holds against the contractor to a *bona fide* transferee without knowledge of the infirmity, and to imply that he has assumed a contract of which he has no knowledge and which he would not have made had he been informed regarding it.

In *Sanger* v. *Upton, 91 U. S. 56, 60,* the court said, in speaking of the capital stock of a company: "The creditors have a lien upon it in equity. If diverted they may follow it as far as it can be traced, and subject it to the payment of their claims, *except as against holders who have taken it bona fide for a valuable consideration and without notice.*"

In *Steacy* v. *Little Rock Railroad Co., 5 Dill. 348,* it was held that transferees of stock, which was not full paid, although represented so to be, could not be held liable, the court saying: "If the representation thus made is true they are under no lia-

bility to pay again. If the shares had been represented to have been unpaid, *non constat,* they would have purchased.    *    *    * Again we ask in what consists the superior equity of the creditor over the obvious equities which exist in favor of such a purchaser of the company's shares? The creditor trusted that the company's officers would not violate their duty; the purchaser trusted that they had not violated their duty." In *Brant* v. *Ehlen, 59 Md. 1, 23,* it was held that where shares are issued as full paid, and sold by the subscriber as such, a promise cannot be implied on the part of a purchaser without notice that he will be answerable to the company or its creditor should the representations prove false, for he could not be held liable on the ground of contract, because he never agreed to purchase any other than full-paid shares, and if the shares were fraudulently issued he would not be liable for the fraud, because he was no party to it. In *Rood* v. *Whorton, 67 Fed. Rep. 434,* where the transferee had no knowledge of the facts which governed the issue of the stock, and there was nothing on the face of the stock from which notice could be inferred that the stock was not paid up, or of any infirmity in the issue, it was held he was not liable, and the court declared that cases of this class were not within the ruling in the *Upton Cases, 91 U. S. 45–72,* and that "the decisions exempt the holder of such stock, who purchases or takes as a creditor, *bona fide,* and clearly so in the absence of recitals or circumstances to give notice.    *    *    * While the certificates are not strictly negotiable paper, they approximate to it as nearly as possible (*Bank* v. *Lanier, 11 Wall. 377*), and the cases above cited recognize that they possess so much of the attributes of negotiability that purchasers in the open market may accept as true the clear representation on their face that they were fully paid."

The cases above referred to contain many citations in support of the rule announced, a rule which appeals to me as wise and just, and, being so persuaded, shall adopt it in this case, with the result that, in my judgment, the transferees of the stock above mentioned are not liable to further payments on account of stock purchased by them.

The next question to be considered is, which of these creditors,

if any, are entitled to relief against the original subscribers? The claims presented are as follows: Henry A. Potter, $6,-210.13; E. P. Wilbur Trust Company, $16,515.58; Lehigh Valley National Bank, $1,002.31; Easton National Bank, $18,-185.75; Henry Short, $2,000; estate of Henry Green, $22,-947.88; estate of Henry Green, $30,100; Frederick Green, $6,655.

As to the claims of the Easton National Bank and Henry Short no substantial defence was interposed, as the claim of the Lehigh Valley National Bank was not proven, and is not now in position to be passed upon, I will hold it for future consideration. The claim for $30,100, on behalf of the estate of Henry Green, was withdrawn before argument, leaving the claims of Henry A. Potter, Frederick Green, the E. P. Wilbur Trust Company and the remaining claim of the estate of Henry Green to be dealt with. Henry Green, on behalf of whose estate a large claim is made, Elisha P. Wilbur, president at the time the stock was issued of the E. P. Wilbur Trust Company, and Henry Potter, were directors of the defendant corporation, and Frederick Green was its secretary and treasurer at the time the stock found to be unpaid was issued, and each, at the time they became creditors, knew the exact condition of the company, and that the stock they now seek to impress with their claims was not issued for property at its value. Their right to hold subscribers for unpaid balances on account of stock issued depends entirely upon the fact that it was issued fraudulently as to creditors. If it was so issued it was by the act of the directors and within the knowledge of the treasurer, and they each extended credit with notice that the stock was not full paid, and that the company had entered into a contract with its stockholders that no further payments would be required. The E. P. Wilbur Trust Company is chargeable with knowledge of all facts possessed by its president, E. P. Wilbur, one of the offending directors. He had notice of the conditions under which the stock was issued, which it was not against his interest to communicate to the trust company, and the presumption is that he did.

It is not every creditor who can call upon a stockholder to

pay an unpaid subscription in satisfaction of his debt, or insti-tute an inquiry as to the value or amount of the consideration given for stock.   It is only those creditors who can fairly allege that they have relied, or whom the law presumes to have relied, upon the amount of the capital stock.   The doctrine that the capital stock is a trust fund for creditors, which the company may not dissipate, cannot be invoked, when the creditor has knowledge of the arrangement under which the stock was issued as full paid.   *First National Bank of Deadwood* v. *Gustin Mining Co., 42 Minn. 327; Cook Stock. § 39; Hospes* v. *Car Company, 48 Minn. 174.*

It therefore follows that these last-named claimants are not in a position to call upon the delinquent subscribers to con-tribute towards the payment of their claims.   I will advise a decree setting aside the contract under which the stock was issued to the original subscribers as full paid, and they will be required to pay to the receiver such proportionate amounts of their unpaid subscriptions as may be sufficient to satisfy the claims of the Easton National Bank and Henry Short, and also the expenses of the receiver's administration, together with the cost of this proceeding.   As these amounts are readily ascer-tainable an order of reference will not be required.