ROSOFF et al. v. GILBERT TRANSP. CO.

(District Court, D. Connecticut. February 13, 1915.)

No. 1319.

1. CORPORATIONS ☞259—INSOLVENCY PROCEEDINGS—COLLECTION OF UNPAID STOCK SUBSCRIPTIONS.

In proceedings to wind up the affairs of an insolvent corporation, where it becomes necessary to levy assessments against unpaid stock subscriptions, it is the general rule that the court will ascertain the amount necessary to be raised, and the amount of unpaid subscriptions, the assessment, when made, to be collected by actions at law against the several stockholders, and will leave any defense which an individual stockholder may have to be determined in the action against him.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1050, 1052–1067, 2272; Dec. Dig. ☞259.]

2. CORPORATIONS ☞232—INSOLVENCY—LIABILITY OF STOCKHOLDERS—UNPAID SUBSCRIPTIONS.

Pub. Acts Conn. 1903, c. 194, § 12, provides that, if any stock of a corporation shall be paid for otherwise than in cash, a majority of the directors shall sign and record a statement showing particularly the property received in payment, and that it is of the value at which it is received. Held, that where stock was issued, to be paid for in property, but no statement respecting the property was made by the directors, and no property was in fact delivered to the corporation, on its insolvency, the holders of such stock were liable for its par value in cash.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. ☞232.]

3. CORPORATIONS ☞237—LIABILITY OF STOCKHOLDERS—EXEMPTION IN MORTGAGE SECURING BONDS.

Where bonds issued by a corporation and secured by mortgage refer to the mortgage for the terms and conditions on which they are issued and secured, the two instruments are to be construed together, and a provision in the mortgage exempting stockholders from personal liability in any case is binding on holders of the bonds.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 907–910, 914–918, 923–929, 931–933; Dec. Dig. ☞237.]

4. CORPORATIONS ☞237—INSOLVENCY—LIABILITY OF STOCKHOLDERS ON UNPAID SUBSCRIPTIONS.

That a surety company, before becoming surety for a corporation, did not investigate its affairs sufficiently to ascertain that a large part of its stock was not paid for, does not relieve the stockholders from liability on their unpaid subscriptions for payment of a valid claim of the surety company arising out of its suretyship.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 907–910, 914–918, 923–929, 931–933; Dec. Dig. ☞237.]

5. CORPORATIONS ☞565—INSOLVENCY AND RECEIVERS—DEBTS PROVABLE.

Under a contract by which a corporation agreed to indemnify and hold harmless a surety company against any expenses or counsel fees incurred by reason of its becoming surety for the corporation, the surety company held entitled to an allowance for expenses incurred, with the approval of the court, in aiding receivers of the corporation to enforce the liability of stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. ☞565.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. CORPORATIONS** ⬤⟹232—LIABILITY OF STOCKHOLDERS—UNPAID SUBSCRIPTIONS.

Under the Connecticut statutes, which require stockholders to pay par value for their stock, the fact that creditors of the corporation knew that its stock was not fully paid does not deprive them of the right to enforce the liability of stockholders for unpaid subscriptions.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 883, 884, 987; Dec. Dig. ⬤⟹232.]

In Equity. Suit by Samuel R. Rosoff and others against the Gilbert Transportation Company. On exceptions to report of special master. Overruled.

See, also, 204 Fed. 349.

John S. Pullman, of Bridgeport, Conn., for plaintiffs and receiver.

George D. Watrous and Harrison T. Sheldon, both of New Haven, Conn., for American Surety Co.

Lewis Sperry, of Hartford, Conn., Charles Phelps, of Rockville, Conn., and Charles Welles Gross, Lucius F. Robinson, and Francis W. Cole, all of Hartford, Conn., for intervening stockholders.

Leonard M. Daggett, of New Haven, Conn., for bondholders' committee.

Eliot Watrous, of New Haven, Conn., for John A. Morse, a bondholder.

George E. Beers, of New Haven, Conn., for John A. Phelps and H. Walter Murless.

THOMAS, District Judge. This matter is now before the court upon the exceptions filed by certain bondholders and stockholders to the acceptance of the report of the special master, to whom this matter was referred pursuant to an order passed by Judge Holt, for a more particular description of which order reference is thereto made:

Before taking up the discussion of the issues raised by the exceptions, I deem it necessary, in view of the importance of this case and the far-reaching effect a conclusion may have, either one way or the other, to rehearse as briefly as possible some of the salient features leading up to the present moment in this litigation.

The Gilbert Transportation Company was organized under the general corporation laws of the state of Connecticut on the 21st day of July, 1905, with an authorized capital stock of $500,000. The main purpose of the company was to conduct a general freight shipping business. At the first meeting of the company, which was held on said date, it was voted to authorize the issue of $1,250,000 of bonds to provide for the purchase of vessels and other property, as well as to raise money for a cash working capital.

On July 29, 1905, the stockholders voted to increase the authorized capital stock from $500,000 to $2,500,000, of which $1,250,000 was preferred and $1,250,000 was common stock. The company continued in business until October 5, 1909, when a bill in equity was filed in this court in behalf of stockholders, bondholders, and other creditors, praying for the appointment of a receiver. Frank S. Butterworth, of New

Haven, was appointed receiver, and in due course turned all of the tangible assets into cash.

The receiver had practically no property of the company that was not covered by mortgage, and realized from the sale of mortgaged property the sum of $91,533.88. Of this amount $64,793.59 was needed, and was used by the receiver, to release the vessels from maritime liens, to preserve the property, and to pay the expenses of administration. After doing this there was a balance on hand of $26,740.29 applicable to the mortgage debt, which was many times that sum. No funds whatever were available for the payment of general unsecured creditors, whose claims aggregated $279,600.

The largest unsecured creditor was the American Surety Company of New York, whose aggregate claims, including assignments from the Degnon Contracting Company, allowed by the commissioner before whom the claims were heard, amounted to the sum of $205,315.83.

At the first meeting of stockholders in 1905, Gilbert submitted the following written proposition:

"New London, Conn., July 21, 1905.

"To the Board of Directors of the Gilbert Transportation Company—Gentlemen: .

"For some years I have been managing vessels for their owners and am now managing the fleet of seven vessels mentioned below. Under my management these vessels have shown net earnings of from 15 per cent. to 38 per cent. of their cost. I have arranged with the owners of these vessels to purchase their entire interests therein for cash or securities of your company for a cost not exceeding the following for the entire ownership of said vessels, viz.:

|  |  |  | Where Built. | Price to Company. |
|---|---|---|---|---|
| Catherine M. Monahan | Tonnage | 871 | Mystic, Conn. | $45,000 |
| Elizabeth T. Doyle | " | 774 | Boston, Mass. | 56,000 |
| Winifred A. Foran | " | 818 | Weymouth, Mass. | 25,000 |
| Glad Tidings | " | 654 | Belfast, Me. | 20,000 |
| Belle O'Neil | " | 467 | Bath, Me. | 15,000 |
| John R. Bergen | " | 647 | Wilmington, Del. | 17,000 |
| Marion F. Rockhill | " | 297 | " " | 4,500 |
|  |  |  | Building. |  |
| Marie Gilbert | " | 600 | Mystic, Conn. | 16,000 |

"I now hold options for the purchase of several of the vessels described in Exhibit A, hereto annexed and made a part hereof, and I expect to be able to acquire for your company thereafter their entire ownership of a majority interest in all or the greater part of said vessels at a cost which will not exceed an appraisement thereof by one or more disinterested shipbrokers or other competent appraisers.

"I now propose that your company shall acquire the fleet now managed by me mentioned above, you assuming the responsibility and expense necessary to complete the Marie Gilbert, and all or some part of the fleet of vessels mentioned in Exhibit A, or a majority interest in each of said vessels at the actual appraised value of said vessels, or any of them, payable in cash or securities of your company on the basis herein provided for.

"For my service in obtaining options and agreements for the purchase of vessels, attending to the organization of your company, and advancing the necessary expenses therefor, the transfer of titles to it, the transfer to it of the lease of the shipbuilding plant at Mystic, Conn., now held by me (your company thereupon assuming the performance of said lease), and in part for my services to the company in the future as its general manager, exclusive of the cash compensation herein provided for, your company shall issue to me its common stock fully paid and nonassessable to the amount of 50 per cent. of the

aggregate par value of all bonds and preferred stock issued by your company during the next three years, and I hereby agree to donate to your company one-half of all such common stock so received by me, to be used by the company for the purpose of acquiring, in connection with its other securities, cash capital and property; the remaining one-half of said common stock to be my sole and absolute property.

"I agree that I will not obligate your company for the payment of any cash for the purchase of vessels or other property, unless there shall be cash on hand in your treasury to cover such purchases, or your company shall have agreements made by good and responsible persons to purchase your securities to an amount equal to or greater than any such proposed purchase or purchases.

"I agree to sell within six months from the date hereof, for your company, its securities for cash on the above basis to raise an 'insurance fund' which will be presented by cash realized from the sale of bonds and preferred stock equal to 5 per cent. of the par value of the aggregate of the bonds and preferred stock issued for and representing vessels purchased, and to raise working capital which will be represented by cash realized from the sale of bonds and preferred stock equal to 3 per cent. of the bonds and preferred stock issued for and representing vessels purchased.

"I now propose that your company shall agree to issue to me or on my order first mortgage bonds and shares of stock of your company on the basis stated below, for all cash furnished your company for working capital or used in the purchase of vessels and other property, or sold for the purpose of raising an 'insurance fund' of your company, viz.:

"For each $1,700 of cash, or for each $1,700 of the cost of appraised market value of any vessels or other property purchased, there shall be issued of the company's securities:

Bonds of the par value of......................................... $1,000
Preferred stock full paid and nonassessable...................... 1,000
Common treasury stock, donated by me............................ 500
                                                                ───────
                                                                $2,500

"On this basis, your bonds will be issued for 70 per cent. of their par value, and your preferred stock at par. And bonds, preferred stock, and common stock of the company, issued to me or on my order, as above provided, not actually used in the purchase of property or disposed of for cash or for expenses in connection with placing the securities of the company, shall be accounted for and returned by me to your company.

"I have read your proposed plan of organization, dated July 21, 1905, which is based upon interviews had by me with your directors preliminary to and expectant upon the making of this proposition by me and the acceptance of the same by your company, and make it a condition of this proposition that all of the representations and conditions therein set forth on your behalf be carried out as part of the agreement arising from an acceptance of this proposition by your company, and that such plan of organization be issued by your company forthwith.

"I make as a further condition to my proposition that I be employed by your company as your president and general manager for a period of five years from date at an annual salary of $7,000, in addition to the stock compensation herein provided for, payable monthly, with the provision that, as the volume of the business of your company increases, my salary shall be raised on a scale satisfactory to me, or I shall have the right to terminate my employment at the end of any year.

"I have an agreement with Messrs. Culver & Whittlesey, my solicitors and the solicitors for the company, that for services, in preparing its certificate of incorporation, by-laws, its plan of organization and subscription list, its stock certificates, bonds, first mortgage, organizing the company, negotiations, advice, and all other services connected with the incorporation and organization of the company, they shall receive the following amount in cash: $2,500 in cash when $105,000 of your bonds are issued, $2,500 in cash when the next $125,000 of your bonds are issued, $2,500 in cash when the next $125,000 of your bonds are issued.

"The fees of these gentlemen, payable at the time and in the amounts above mentioned, together with their disbursements and all disbursements made by me for organization expenses of your company, shall be assumed and paid by your company, and said firm of Culver & Whittlesey shall be retained to act contemporaneously during the term of my employment as president and general manager.

"Trusting to be advised of the acceptance of this proposition at an early date, I am,

"Very truly yours,                    [Signed]   Mark L. Gilbert."

Annexed to this letter was a list of vessels needed for the corporation, which were referred to in the letter.

The board of directors, to whom this letter was addressed, passed a vote at its first meeting, held on the 21st day of July, 1905, the essential portions of which, as they relate to this controversy, were as follows:

"The clerk then read to the meeting the minutes of the first meeting of the incorporators and subscribers to the capital stock of the corporation, from which it appeared that at said meeting a certain proposition from Captain M. L. Gilbert, dated July 21, 1905, relative to the acquisition of further vessels in the future, the employment of Captain Gilbert as general manager of the company, together with a form of bond, and a form of mortgage securing a proposed issue of first mortgage bonds to an amount not exceeding one million two hundred and fifty thousand dollars ($1,250,000), had been unanimously approved at said meeting.

"At this point Captain Gilbert withdrew from the meeting. Mr. Williams, the vice president took the chair.

"Thereupon, and on the suggestion of the chairman, the said proposition from Captain Gilbert and the proposed form of bond and mortgage were read to the meeting. After a full discussion as to the advisability of the company's accepting the proposition of Captain Gilbert, and authorizing the grant and issuance of bonds secured by the mortgage in the form read to the meeting, Mr. Howard moved, seconded by Mr. Williams.

"Resolved, first, that the proposition from Captain Gilbert, dated July 21, 1905, just read to this board, be and the same hereby is accepted in its entirety."

Part of section 12, chapter 194, of the Public Acts of Connecticut for 1903, reads as follows:

"If any stock shall be paid for otherwise than in cash, a majority of the directors shall make and sign upon the record book of the corporation a statement showing particularly of what the property received in payment for stock subscriptions consists, and that it has an actual value equal to the amount for which it is so received. The judgment of the directors as to the value of property accepted in payment of stock shall be final; but the directors concurring in the judgment of such value, in case of fraud in the overvaluation of such property, shall be jointly and severally liable to the corporation for the amount of the difference between the actual value of any property so accepted in payment at the time of such acceptance, and the amount for which it is received in payment. The secretary shall keep a record of the names of the directors concurring in such judgment of value."

The record book of the corporation contains no statement, signed by a majority of the directors, "showing particularly of what the property received in payment for stock subscriptions" consisted, nor does it contain any statement by a majority of the directors that the property had an actual value equal to the amount for which it was received. Neither the record book nor any other of the company's

records contains any statement whatever of property received in payment of common stock.

Mark L. Gilbert did deliver to the company, in accordance with the terms of his letter of July 21, 1905, certain interests in vessels which he owned, and received full value in preferred stock.

There are no other credits to Mark L. Gilbert on the books of the company, for anything received from him under the terms of his letter of July 21, 1905. The options and other things of claimed cash value were never put on the books of the company and never counted into the company's assets in any way. This so-called property had no value and was not delivered to the company. Gilbert's salary was adequate compensation for any services rendered.

All of the common stock of the company outstanding was issued to Gilbert on the apparent theory that the company's acceptance of his proposal was warrant enough. Under the scheme, one half of such common stock was to belong to Gilbert as his own property, and the other half was to go to the company and be used as "bonus" stock. All that the company ever received for any of this common stock was $2,780, which amount was paid on shares having a par value of $13,900. Gilbert retained 1,298 shares, and 2,791 shares were given to the stockholders as a bonus.

On the 24th day of April, 1911, the receiver was authorized, by order of this court, upon the advice of counsel and with the approval of the American Surety Company and the bondholders' committee, to institute action against the several holders of common stock whose stock was then unpaid for or but partially paid. The court also included in the order certain holders of preferred stock who had paid less than par to the company when the preferred stock was issued to them. The amount so due on preferred stock, however, was comparatively small.

Pursuant to said authority, the receiver instituted suits in the state courts in Connecticut against a considerable number of stockholders who owned the largest amounts of unpaid stock. While these suits were pending, the defendant stockholders brought an intervening bill in equity to this court, praying for a stay of the suit in the state courts, and for an order of reference to determine the amount of the debts and the amount of the assessment necessary to pay them. Upon this bill, after hearing had, an order of reference was made by Judge Holt in May, 1913, and a special master was appointed to—

"hear, ascertain, and report to this court for its determination:

"First. The amount of the claims of creditors, if any (allowed by the commissioner of this court heretofore appointed), which would be entitled to be paid out of the proceeds of an assessment upon the stockholders, or any of them, if such assessment were ordered by this court on account of any unpaid balance, if any, upon the shares of the capital stock of said the Gilbert Transportation Company held by such stockholders or any of them.

"Second. The portion of the costs and expenses of this cause, including the receivership, both such costs and expenses as have already been incurred and as reasonably may be incurred hereafter, as should properly be included in determining the amount of an assessment, if any, against said stockholders.

"Third. The amount, if any, unpaid upon the shares of the outstanding stock of said the Gilbert Transportation Company.

"Fourth. The amount of the assessment, if any, which should be made

against holders of unpaid stock, making fair allowance to cover failures in recovery after hearing such testimony as may be offered as to the inability of any stockholder to respond, in order to obtain sufficient moneys to pay the amount of the aforesaid debts and expenses found payable from any recovery from stockholders, so that no stockholder shall be called upon to pay more than the pro rata share of the balance which in equity he ought to be called upon to pay upon each share of stock held by him, with leave to any creditor to move for a further assessment in case of the inability of the receiver to recover sufficient to pay such debts and expenses."

The special master, pursuant to said order, heard the parties and filed his report, finding:

"First. That the claims of creditors to be paid out of the proceeds of an assessment upon stockholders, if such assessment were ordered, amounted to $344,294.42.

"Second. That the costs and expenses of the case, which should be included in determining the amount of the assessment were $21,500.

"Third. That the amount unpaid upon the outstanding common stock was $407,320, and on the outstanding preferred stock was $29,696.33.

"Fourth. That, after making allowance of $129,800 to cover failure in recovery in case of known inability of stockholders to respond, the amount of the unpaid balance available to be assessed was $307,216.33, and the amount of the assessment which should be made was the full amount of the unpaid balance of the stock at 100 per cent."

So, as already stated, certain stockholders and bondholders have filed exceptions to this report.

The rulings and findings of the special master to which exceptions have been filed may be classified under six heads, as follows:

(1) The ruling of the master that he was not concerned with the individual liability or individual defenses of any stockholder, and that the inquiry in the reference was limited to a determinaton, so far as the stock is concerned, to the question of whether it was unpaid stock or full paid stock, and, if paid in part, to what extent it remained unpaid.

(2) The ruling of the master that for the purpose of determining the full paid or unpaid character of the shares of stock issued by the Gilbert Transportation Company. the question of the value of the property turned over in payment for these shares which were not paid for in cash was to be inquired into and decided, and the transaction concerning common stock between Gilbert and the company examined.

(3) The finding of the master with respect to the claims of the bondholders.

(4) The finding of the master with respect to the claims of the American Surety Company.

(5) The finding of the master that creditors are entitled to participate without reference to notice, or to dates when credit was given, or to the fact that the creditors were also bondholders.

(6) The allowance of the master for future expense.

We will take up these six heads in the order named:

[1] First. An examination of the order of reference sufficiently disposes of the exceptions to the rulings contained under the first heading.

The order directs the master to ascertain "the amount, if any, unpaid upon the shares of the outstanding stock of said the Gilbert Trans-

portation Company." There is nothing in the order which suggests any departure from the course suggested in the memorandum of decision upon which the order was founded, namely, that the question, whether any stockholder is liable to respond to the assessment because of individual defenses, should be determined in the suits to collect the assessment, and not in the reference. Rosoff v. Gilbert Transportation Co. (D. C.) 204 Fed. 349.

This ruling is in accordance with the weight of authority:

"Whatever defenses individual stockholders may have against the claims for payment of installments called for on their individual shares will come up for consideration when future proceedings may be instituted to recover such installments from them." In re Monarch Corporation, 203 Fed. 664, 122 C. C. A. 60.

"In a hearing on an application by a receiver to levy assessments on unpaid subscriptions and for the collection of the same, the special defenses of the subscribers will not be considered. The court will only ascertain the amount of the debts, the names of the stockholders who have not paid, and the amount of the assessment necessary." Cook on Corporations (6th Ed.) § 207; In re Munger Vehicle Tire Co., 168 Fed. 910, 94 C. C. A. 314.

It is the general rule that the assessment, when made, shall be collected by suits at law by the receiver against the individual stockholders. Glenn v. Sumner, 132 U. S. 152, 156, 10 Sup. Ct. 41, 33 L. Ed. 301; Smith, Receiver, v. Johnson, 57 Ohio St. 486, 49 N. E. 693. This fact, and the further fact that generally no notice to stockholders is necessary to uphold the validity of the assessment, show that, in the determination of the amount of the required assessment, it is not incumbent upon the court to pass upon the defenses of the individual stockholders. Brown v. Allebach (C. C.) 156 Fed. 697, 698. The present proceeding is not adapted to the determination of such defenses. Cumberland Lumber Co. v. Clinton Hill Lumber & Mfg. Co., 64 N. J. Eq. 517, 54 Atl. 450.

The master has found the amounts unpaid upon the stock held by the several stockholders. They appeared and were heard upon this point. To this extent the decision is final. If, however, a stockholder has any individual defense, he will have ample opportunity to present his defense when the receiver endeavors to collect the assessment.

[2] Second. Under this head the master found that all of the outstanding common stock, amounting to $422,800, was issued to one Gilbert, and that eventually the greater part of it was used as "bonus" stock, as an aid to the sale of the company's preferred stock or bonds.

The master also found that no cash or property was turned over to the company by said Gilbert or any one else in payment for these 4,228 shares of stock, except in the case of 139 shares, on which $2,780 in cash was paid by the subsequent purchasers thereof.

The third section of the order of reference provides that the master shall ascertain "the amount, if any, unpaid upon the shares of the outstanding stock of said Gilbert Transportation Company."

In order to determine the amount unpaid, the master correctly held that it was necessary to inquire into the value of any property turned over in payment for the stock. It appears that no certificate signed by the directors of the company, as required by section 12 of the Connec-

ticut Corporation Law, certifying the value of such property, had ever been executed. It is unnecessary to determine what effect such a certificate would have had. Without it, the only way to determine the amount unpaid on the stock was to inquire into and determine the value of any property turned over in payment for the stock.

The master made such inquiry, but found that the books of the company showed that no property was in fact delivered to the company in payment for the common stock, and that no common stock was issued because of any property turned over to the company. Under these circumstances, his inquiry into the value was immaterial. The services of Gilbert could not have been worth any such vast sum, by any possibility, as named in his letter. He was to receive an annual salary of $7,000, with a substantial increase satisfactory to himself as the business increased. There is no evidence that the directors placed any higher value on his services than $7,000, and, had they done so, their good faith might, perhaps, have been open to question. Certain it is, as the matter was done, Gilbert's services could not be used as a basis for the issue of any stock to him, and such stock be deemed full-paid stock under Connecticut law.

An examination of the whole arrangement relative to the issue of common stock shows it to have been a transparent scheme to issue a large block of common stock without property of any value being received by the company therefor, and utterly at variance with the letter and spirit of the Connecticut statute. If the company acquired any of the property set forth in Gilbert's letter, it appears that it paid full value for it in preferred stock, and that no cash or property was in fact delivered to the company for common stock, except in the case of the 139 shares mentioned above. It is clear, therefore, that there is no merit in this exception to the master's report.

A similar situation arose under the Connecticut statute in the case of In re Monarch Corporation, 203 Fed. 664, 665, 667, 122 C. C. A. 60, where the court said:

"The total amount of authorized capital stock was $500,000. Of this $25,000 was subscribed and paid for in cash. The remaining $475,000 was subscribed for, to be paid by the delivery of property other than cash. This property consisted of two certain patents of the United States relating to the use of carbonic acid gas. At the first meeting of stockholders (January 13, 1906) a resolution was adopted declaring that these patents were in their judgment of the reasonable value of $475,000. At the directors' meeting a similar resolution was adopted.

"Neither of these patents was ever assigned to the corporation; indeed, neither of them was ever assigned by their owners to the persons who had subscribed for the $475,000 shares of stock. These persons, however, did transfer to the corporation an option which they held from the owner to purchase one of these patents for $20,000, on which option $2,000 had been paid. The option included a license to manufacture and sell under the patent for two years.

"It is contended by respondents that these 4,750 shares were never issued. The record does not sustain this contention. Certificates of stock (common and preferred) in the usual form of such certificates covering the entire 5,000 shares (including those paid for in cash) were executed, removed from the stockbook, and handed over to five different individuals, or their representatives. One of the subscribers received certificates which stood in the names of two of the others, under an agreement that he would hold their shares

with which to raise the $18,000 necessary to pay the balance due under the option. But these certificates were actually issued by the corporation, were issued as full-paid nonassessable stock, so that they or part of them could be sold to raise that money.

"1. The District Judge held that the property actually turned over was the full equivalent of that agreed to be turned over, and that therefore the 4,750 shares of stock were in fact full-paid. We are unable to concur in this con-clusion. The full ownership of two patents is something materially different from the ownership of a contract which gave the holder the right to buy one of the patents for $18,000, with an exclusive license to manufacture, sell, and use under that patent only during the continuance of the option, two years; the patent not expiring until 1915. Moreover, there is nothing to show that under section 12 of the Connecticut statute the board of directors ever signed a statement, or ever even voted, that 'the option' had an actual value equal to $475,000.

"2. The main contention of the respondents is that, where the specific prop-erty which has been valued and is to be transferred for stock has not been in fact turned over, there can be no cash installment called for. They insist that the 'balance due' from the stockholder necessarily depends upon the terms of the subscription contract. This last proposition may be conceded. The argument, briefly stated, is as follows:

"Subscriptions to pay in cash are payable only in cash; subscriptions to pay in property generally—in coal or flour, etc.—are payable in property pri-marily, but on default are payable in cash. In such cases, the agreement is to pay in money or in money's worth. But it is contended that if a subscrip-tion is payable in some specific property, such as a parcel of land, a patent, or what not, it does not, upon default, become payable in money; that the subscribers cannot say, in this case: 'It is inconvenient for us to give you the patents; but here is $475,000, their value in money. Take it, and give us the stock.'

"Under this theory they say that the 'unpaid balance' is not a sum of money, but the specific property which was not turned over. We do not need to dis-cuss the authorities cited in support of this proposition generally, nor to ex-press our opinion upon it, because the state of Connecticut has legislated upon this subject, and the nature of the contract of subscription, or of the contract entered into by purchase and holding of stock, is to be determined in the light of that legislation. * * *

"We construe this Connecticut statute as providing that if a prospective stockholder wishes to pay in property, instead of cash, and the corporation assents to such method of payment, he may do so by having his property val-ued at some specific sum by the directors, and using such valued property, instead of cash, to pay the full value of the stock which is issued to him. But if, after thus getting his property made a legal tender for the stock, he does not use that legal tender to pay for it—either because he changes his mind about parting with the property, or because he cannot get the legal title to it—and does not repudiate his proposed arrangement, saying, 'I cannot give the property and therefore will not take the stock,' but, on the contrary, does take stock certificates to all appearances representing full-paid stock, he must make good what he has not paid in the only available legal tender."

[3] Third. This part of the finding of the master referred to the claims of stockholders.

(a) In view of the conclusions reached, it becomes a matter of no concern to the stockholders whether the allowance by the master of a part of the claims of bondholders is sustained or overruled. The as-sessment must be 100 per cent. in either event.

Many of the claims against the stockholders are so small that the cost of collecting the same may exceed the amount of money realized. In other instances, the financial position of many stockholders will doubtless be such as to make it unwise for the receiver to expend

money for the purpose of bringing suits against them, as in such cases, the amount actually collected is often but a small proportion of the amount actually due.

"It is therefore unnecessary to discuss the action of the master in allowing that part of the stockholder's claim amounting to $64,793.59, needed to re-establish the fund to which the bondholders are entitled to look for the payment of their bonds. For the present I will pass the question, without deciding it, for it seems to rest on a different footing from the bulk of the bondholder's claims, which are next discussed.

"The final determination of the question of whether the bondholders are entitled, in respect to this sum of $64,793.59, to share in any proceeds that the receiver may collect from stockholders, can await the further action of the court, and be disposed of when the receiver reports that he has such funds to distribute."

(b) The bondholders have excepted to the disallowance of the major part of their claim. The bonds held by such bondholders provide, in part, as follows:

"This bond is one of a series of first-mortgage twenty-year six per cent. gold coupon bonds * * * issued and to be issued to an amount not exceeding in the aggregate the principal sum of one million two hundred and fifty thousand dollars at any one time outstanding, in pursuance of and equally secured by a mortgage dated the fifteenth day of August, 1905, * * * to which mortgage reference is hereby made for a statement of the property so mortgaged and the terms and conditions upon which said bonds are issued and secured. * * * This bond shall not become obligatory for any purpose until the certificate hereon indorsed shall be executed by the trustee under said mortgage. The said certificate shall be conclusive evidence that the bond so certified has been duly issued under said mortgage and and is entitled to the benefits of the trusts hereby created."

This undertaking is followed by a qualifying clause which appears in paragraph 12 of the mortgage which has been accepted by the bondholders, and reads as follows:

"Article XII. Immunity of Officers, Directors or Stockholders, from Liability.—For the due performance of each and all of the covenants in this indenture, or of any covenant in any bond or coupon, the mortgagor shall be individually and personally liable; and the said bonds and coupons are executed and issued by the mortgagor, and accepted by the owners and holders thereof, on the express covenants and conditions precedent that no personal or individual liability shall exist or be claimed to exist thereon and no recourse thereon shall be had in favor of any holder or owner thereof, against any or all of the incorporators, stockholders, officers, or directors of the mortgagor, either directly or through the mortgagor, by the enforcement of any assessment of call or by any legal or equitable proceeding by virtue of any statute or otherwise, for or by reason of any claim of liability or responsibility of any kind or nature whatsoever. Each owner or holder of bonds or coupons hereby releases and discharges the said persons and to each of them any right to question the value of property or services exchanged for stock as fully paid and any and all common law or statutory liability that might exist or be claimed to exist in the premises, whereby said persons or any of them might be or become, or be claimed to be or become, liable for the debt secured by this indenture, or for any part thereof."

It appears, therefore, that in the contract between the bondholder and the corporation reference was made to the mortgage for "the terms and conditions upon which said bonds are issued and secured."

With respect, therefore, to the portion of the bondholder's claim which was disallowed; the master's finding is sustained:

"That the bond and mortgage must be read together, and that the debt which the corporation owes to the bondholders cannot be enforced against a stockholder who may be obligated to the company or to creditors thereof for unpaid stock, and the owners of these bonds are not entitled to favor in an assessment against the stockholders of this corporation."

[4] Fourth. This section of the master's finding concerns the claim of the American Surety Company. The Degnon Contracting Company proved a claim against the Gilbert Transportation Company before Commissioner Park for $161,700. This claim arose through the default of the Gilbert Transportation Company in the performance of its contract with the Degnon Contracting Company in connection with the construction of the Cape Cod Canal.

The Degnon Contracting Company, when that contract was made, required an indemnity bond from the Gilbert Transportation Company, conditioned on the faithful performance of the contract by the Gilbert Transportation Company. The American Surety Company became surety on such bond in the sum of $150,000. After the Degnon Contracting Company had proved its claim against the Gilbert Transportation Company the American Surety Company paid the Degnon Contracting Company $125,000 in cash, in full settlement of the obligation upon the bond, and took an assignment of the claim of $161,700 against the Gilbert Transportation Company, and received three notes, aggregating $25,000, and $4,000 of receiver's certificates. The American Surety Company has an independent claim for $7,388 against the Gilbert Transportation Company, which was also allowed by the commissioner.

The American Surety Company claimed before the master that it was entitled to participate in an assessment to the extent of $198,088, with interest. The master allowed the American Surety Company the $125,000 actually paid, and disallowed the balance of the claim of $161,700. He allowed the claims for $25,000 on the notes, and the independent claim of $7,388. He also found that by reason of the contract between the Gilbert Transportation Company and the American Surety Company, by virtue of which the indemnity bond was given, that the American Surety Company was entitled to an allowance of $8,182.55 for expenses, counsel and other fees, to the date of the report, and he allowed interest on the various claims from November 1, 1913, and found that the total amount to which the American Surety Comapny was entitled was $205,315.93. The master also allowed $4,000 of receiver's certificates originally held by the Degnon Contracting Company, but which were turned over to the American Surety Company as part of its settlement.

At the hearing before the master, the stockholders insisted upon going into the details of the inquiry and investigation made by the American Surety Company of the affairs of the Gilbert Transportation Company before becoming surety on the bond. The stockholders claimed that certain information to which the American Surety Company had access was not made use of by the Surety Company, that its

investigation was not thorough, and that therefore the Surety Company was charged with notice of the financial condition of the Gilbert Transportation Company, and of the fact that that stock was not paid for, and that the Surety Company, in consequence thereof, was not entitled to participate in an assessment.

It does not appear that the American Surety Company did acquire an actual knowledge of the fact that the stock was not paid for. Its investigation proved satisfactory to itself, and it issued the bond. It does not appear that the investigation was not conducted in a reasonable manner; but, even if it had not been, it would not follow, necessarily, that the American Surety Company was therefore chargeable with knowledge of the fact that the stock was not paid for. It owed no duty to the stockholders of the Gilbert Transportation Company to make an investigation of the affairs of that company to determine whether its stock was paid or unpaid, and its failure to make such an investigation would not bar it from participation, nor relieve the stockholders of their responsibility to pay for their stock. Even if the American Surety Company had acquired knowledge that the stock was unpaid, it would not, even then, be barred under Connecticut law. There is, therefore, no foundation for the claim made by the contestants that the American Surety Company is entirely barred from participation.

The only question under this head is relative to the various items allowed by the master. It follows, therefore:

(a) That the American Surety Company's claim of $125,000 was properly allowed by the master.

(b) That there is no objection to the allowance of the claim of $7,388, with interest.

(c) That the claims based on the notes aggregating $25,000, and on the receiver's certificates, amounting to $4,000, rest substantially upon the same basis. It appears that the notes were assigned to the American Surety Company by the Degnon Contracting Company on the 14th day of February, 1912, when the former paid the latter $125,000 cash, in full settlement of its obligation on the bond, and that the $4,000 of receiver's certificates were secured in the same way and at the same time.

As is stated with reference to a part of the bondholders' claim, it is clear that a 100 per cent. assessment against stockholders will be needed in any event. The right of the American Surety Company to participate in these two items can be determined later.

[5] (d) Exceptions were filed to the allowance of the $8,182.55. A portion of the contract between the Gilbert Transportation Company (indemnitor) and the American Surety Company (surety), by virtue of which the bond was executed by the Surety Company, reads as follows:

"That the indemnitor will perform all the conditions of said bond and any and all renewals and extensions thereof on the part of the indemnitor to be performed, and will at all times indemnify and save the surety harmless from and against every claim, demand, liability, cost, charge, counsel fee (including fees of special counsel whenever by the surety deemed necessary), expense, suit, order, judgment, and adjudication whatsoever, and will place the surety

In funds to meet every such claim, demand, liability, cost, charge, counsel fee, expense, suit, order, judgment, or adjudication against it by reason of such suretyship, and any and all renewals thereof, and before it shall be required to pay the same."

There were not sufficient funds in the receiver's hands to warrant his proceeding against the stockholders, and this court approved an agreement between the Surety Company and the bondholders' committee that they would share the expenses of such proceedings. Pursuant to this agreement, the Surety Company expended a large amount in the investigation of the affairs of the Gilbert Transportation Company and a large amount to cover the legal expenses of the receiver. These items were properly allowed under the order of this court, as well as by virtue of the contract above quoted. The additional allowance for counsel fees for counsel employed by the Surety Company is reasonable, and is properly allowed. The exceptions to the master's finding in this respect are overruled.

[6] Fifth. This section referred to the exceptions based on the finding of the master that creditors are entitled to participate without reference to notice, or to the time when credit was given, or to the fact that the creditors are also stockholders.

Counsel for the stockholders claim in substance that, where a creditor has notice or knowledge that stock is unpaid when he extends credit, he is not entitled to participate in an assessment against stockholders, and that the same result follows both when the creditor is also a stockholder and when credit is extended before stock is issued.

These claims are based on the erroneous theory that the liability of stockholders to respond to an assessment in Connecticut is by reason of the "trust fund" or "fraud" theory resorted to by the courts of many states to protect creditors of fraudulent corporations. In Connecticut, however, resort has never been had to this theory, for under the Connecticut law, while a stockholder is not liable for the debts of the corporation, he is bound to pay the par value for his stock, and any scheme to avoid doing so by agreement with the corporation is ultra vires and void. Northrop v. Bushnell, 38 Conn. 498, 512; New Haven Trust Co., Receiver, v. Gaffney, 73 Conn. 480, 47 Atl. 760; Ward et al. v. Griswoldville Mfg. Co., 16 Conn. 593, 597; Mann v. Cooke, 20 Conn. 178, 188, 189.

There is no suggestion that the "trust fund" or "fraud" theory is the basis of the liability in Connecticut, or that the creditors' right to participate is based on these theories. The creditors are held to have a legal rather than an equitable right. It is true that the stock of a corporation being wound up is a "trust fund" for the payment of its debts, as was said in Barrows v. Natchaug Silk Co., 72 Conn. 658, 662, 45 Atl. 951; but the right of the creditor to be paid has never been regarded as resting upon the "trust fund" theory as claimed by counsel for stockholders. Clearly the theory of the Connecticut law is that all creditors are entitled to be paid.

In Johnson, Trustee, v. Allis, 71 Conn. on page 219, 41 Atl. on page 820, the court said:

"The plaintiff represents the creditors of the insolvent corporation. His duty is to pay these creditors whatever the corporation owed to them so far

as its assets will enable him to do so after paying the expenses of the insolvency proceedings. He cannot collect of a delinquent subscriber to its stock any more than is needed for this purpose. The defendant claims that what this amount is should be specially set out in the complaint. But that is a matter to be proved. A plaintiff is never obliged to prove more than the substance of its complaint. In this case the plaintiff claims to recover the whole amount of the defendant's unpaid subscription. Under that claim he may recover so much (not exceeding the whole) as the proof shows is needed to pay the creditors in full, together with the expenses of the settlement."

The Connecticut Corporation Act provides:

"Sec. 16. Stockholders' Liability.—Every stockholder, whether an original subscriber or not, shall be liable for any balance due on the stock held by him. If a corporation is placed in the hands of a receiver or a trustee in insolvency or bankruptcy, such receiver or trustee shall have the powers of the board of directors in calling in installments on stock. If a creditor of a corporation shall obtain a judgment against it, and execution thereon shall be returned unsatisfied, such creditor may recover from any stockholder in such corporation the balance remaining due and unpaid on any stock held by him, so far as may be necessary to satisfy the debt. No subscriber for or holder of stock shall be liable as such for any payment of such stock, or for any debt of the corporation, after the par value of his stock has been paid."

This act seeks to secure the payment of the par value of stock, and to require stockholders to pay the par value, and exempts the stockholders from liability therefor when, and only when, the par value of his stock has been paid.

There is no suggestion that certain creditors can enforce this liability and that certain other creditors cannot. The statute clearly contemplates that all creditors are entitled to be paid, and that stockholders are bound to pay them if the stock held by them has not been paid for in full.

The Supreme Court of Connecticut in the case of New Haven Trust Co., Receiver, v. Gaffney, supra, used the following language:

"Any contract by the company to issue shares at less than par was consequently ultra vires. The defendant, by taking the shares in question, became, under his contract of membership, liable to pay $100 for each of them. The condition that less was to be accepted, being ultra vires, was void. Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24 [11 Sup. Ct. 478, 35 L. Ed. 55]. We have no occasion to determine whether an ordinary moneyed corporation could make such a contract. See 1 Cook on Stock & Stockh. (3d Ed.) §§ 166–170; 2 Thomp. on Pri. Corp. §§ 1511–1514. The company which the receiver represented could therefore have maintained this action, and the plaintiff has the same right."

While the principles here laid down were not then held to be applicable to the case of an ordinary moneyed corporation, yet it is clear that, since the passage of the Corporation Act, the principles of that case are applicable to every corporation.

This case has been approved by the Supreme Court since the passage of the Corporation Act in Stanford Trust Co. v. Yale & Towne Mfg. Co., 83 Conn. 43, 51, 75 Atl. 90.

The New Jersey law is quite similar to the Connecticut law, and the distinction between the right to participate in a recovery under the "trust fund" or "fraud" theory and under the statutory theory is carefully considered in Easton National Bank v. American Brick &

Tile Co. et al., 69 N. J. Eq. 326, 60 Atl. 54; Id., 70 N. J. Eq. 732, 64 Atl. 917, 8 L. R. A. (N. S.) 271, 10 Ann. Cas. 84, decided in 1906. On page 739 of 70 N. J. Eq., on page 919 of 64 Atl. (8 L. R. A. [N. S.] 271, 10 Ann. Cas. 84), Justice Pitney, writing the opinion, said:

"But, so far as this so-called 'trust fund doctrine' excludes any creditors from relief against the stockholders, it does so on the theory that the liability of the latter rests alone upon their having held out the capital of the company to persons extending credit to it as the source from which repayment might be expected. If this be the only foundation of the stockholder's liability, it is perhaps not irrational to debar creditors whose claims accrued prior to the stock issue in question, and subsequent creditors who had notice when they extended credit that the stock issue did not represent in whole or in part what it purported to represent; that is, an equivalent amount in value added to the assets of the company. But in this state the stockholder's liability to creditors does not depend alone or chiefly upon the theory of 'holding out.' It depends upon the stockholder's voluntary acceptance, for considerations touching his own interest, of a statutory scheme to which watered stock, under whatever device issued, is absolutely alien, and which requires stock subscriptions to be made good for the benefit of creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none."

Continuing, on page 745 of 70 N. J. Eq., on page 922 of 64 Atl. (8 L. R. A. [N. S.] 271, 10 Ann. Cas. 84), Justice Pitney said:

"We do not wish to be understood as assenting to the reasoning of the foregoing cases so far as they debar from recourse to the stockholders' liability those creditors whose claims accrued before the stock issue in question, and those subsequent creditors who extended credit to the company with knowledge that the stock was issued as full paid when it was not full paid in fact. With respect to prior creditors the query arises, why may they not resort to after-acquired property of the company, and as well stock subscriptions as more tangible assets? With respect to subsequent creditors, the query is, why, if they knew the stock issued as full paid was not full paid in fact, may they not be justified in dealing with the very stockholder's liability for the purpose of satisfying creditors' claims? But without spending time in discussion of these questions, we content ourselves with saying that our Corporation Act places the stockholder's liability to creditors upon a firmer foundation than the 'trust fund doctrine' as expounded in the above cases; the statute absolutely prohibiting agreements for the issue of stock for a consideration less than its par value, and affording relief to all creditors without distinction."

The distinction is further emphasized in a more recent New Jersey case decided in 1912. In Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 143, 82 Atl. 618, 627, the court said:

"It may be asked, then, why are stockholders held liable in these cases? The answer is that their liability is a legal one, imbedded in the acts of the Legislature and uniform decisions of the courts."

In the two New Jersey cases above referred to, and in the case of Gillett v. Chicago Title & Trust Co., 230 Ill. 373, 82 N. E. 906 (Ill. 1907), the court distinctly held that the liability of a stockholder to pay a sufficient amount of the unpaid balance on his stock to satisfy creditors in full was not affected by the fact that the creditor knew or did not know, when he extended credit to the corporation, that the stock was in part unpaid. Under the Connecticut law the same result

follows. All creditors are entitled to participate in the proceeds of an assessment against stockholders. Therefore the exceptions to this portion of the master's report are overruled.

Sixth. This finding of the master pertains to the exceptions to his report making an allowance for future expenses of the receivership. As this allowance was clearly made in accordance with the second section of the order of reference, the exception is overruled.

For the reasons given in this opinion, all the exceptions to the master's report are overruled, except in so far as no decision is now made with reference to the right of the bondholders to participate to the extent of $64,793.50, or of the American Surety Company to participate for the $25,000 of notes and $4,000 of receiver's certificates.

With these three exceptions, the report of the master is accepted, and his findings and conclusions are adopted. The motion to recommit is denied.

Let an order be prepared adopting the report, except as above noted, making an assessment against the owners of unpaid or part-paid stock to the amount unpaid on the par value thereof in accordance with the finding of the master.

Let an order be entered that the stay of proceedings against stockholders be vacated, and that the receiver proceed to collect the assessment hereby ordered, in the pending suits or in new suits, as may seem to the receiver most advisable. Let the order also specify the claims allowed to participate in the fund thus created in accordance with the master's report.

Decree accordingly.